The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Anthony Ivan TRUJILLO, Defendant–Appellee.

No. 88SA147.

Supreme Court of Colorado, En Banc.

May 30, 1989.

---

Douglass F. Primavera, Dist. Atty., Amanda Pearson, Deputy Dist. Atty., Alamosa, for plaintiff-appellant.

David F. Vela, State Public Defender, Ruth M. Acheson, Deputy State Public Defender, Alamosa, for defendant-appellee.

MULLARKEY, Justice.

The district attorney brings this interlocutory appeal pursuant to C.A.R. 4.1 to challenge an order of the Alamosa County District Court which suppressed certain evidence including a microwave oven, the defendant's boots, and the defendant's statements.[1] We affirm in part the district court's suppression order and reverse in part and remand for further proceedings consistent with this opinion.

### I.

The defendant, Anthony Trujillo, was charged with second degree burglary, first degree arson, and theft by receiving. After entering a plea of not guilty, Trujillo filed a motion to suppress all statements allegedly made by him during his detention and all evidence collected from him as fruits of his detention. At the suppression hearing, the trial court heard testimony from three police officers and Trujillo, and made extensive findings of fact which we summarize as follows.

In the late afternoon of November 25, 1987, Alamosa police officer Leroy Chacon was on patrol in a marked police car when he observed two men walking on the sidewalk toward his car. One of the men, later

---

1. The People also appeal the trial court's order of April 21, 1988 which found that the state did not preserve potentially exculpatory evidence from the alleged arson scene. However, because the People did not file their notice of appeal until May 10, 1988, the ten day time limit requirement of C.A.R. 4.1(b) has not been met and this court is without jurisdiction to hear this issue.

identified as the defendant, Anthony Trujillo, was carrying what the officer thought was a large box. As the officer drove past the two men, the man carrying the box noticed the police car and handed the box to his companion. Both men continued walking without changing their pace. Because Officer Chacon thought this conduct was suspicious, he decided to contact the two men. The officer testified that the area was a high crime area, but he acknowledged that there were apartments in the immediate vicinity and that it was not unusual to see residents carrying personal belongings in the area.

For his own safety, Officer Chacon called for police backup, which arrived a few minutes later. Officer Chacon and two other police vehicles stopped directly in the path of the two men carrying the box as the men crossed a vacant lot. When the police approached the two men, they realized that the box was actually a microwave oven. The police stopped the two men for questioning, examined the microwave, and processed the serial number of the microwave through the police computer to determine if it was stolen. The computer check did not show the microwave as stolen, but Officer Chacon remained suspicious. The officer asked Trujillo to explain what he was doing with the oven. Trujillo replied that he had purchased the oven for his mother's birthday but that he was trying to sell it in order to buy a bus ticket to Denver. He offered to sell it to the officers for $20.

To verify Trujillo's story, partly because he was thinking of buying the microwave for himself, Officer Chacon used his car radio to have the police dispatcher contact Trujillo's mother. She said that she had a microwave but it was not clear whether the one which Trujillo was carrying was hers. According to the officer, Trujillo's mother then said that she would like to speak with her son, but the officer would not allow him to speak over the radio. Instead the officer said he would give Trujillo a ride to a telephone where he could talk to his mother. The officer then took Trujillo to the squad room at the police station where the officer telephoned Trujillo's mother and discussed the oven again with her before

he let Trujillo talk with her. As Trujillo spoke with his mother, Officer Chacon overheard him conversing about turkeys, microwaves and Thanksgiving. Unable to uncover any evidence of wrongdoing, the officer finally told Trujillo that he was "free to go" and offered to drive him back to the spot where the police had originally found him. Trujillo accepted his offer.

As Officer Chacon started to put the microwave back into the patrol car, he noticed an Alamosa County identification label on the bottom corner of the microwave. He telephoned Investigator Lopez who confirmed that a burglary and arson had occurred early that morning at the County Department of Social Services building in Alamosa. Trujillo was taken into custody and, although he was not free to leave, he was not formally arrested.

Shortly thereafter, Investigator Lopez arrived at the station. Trujillo was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but he refused to sign a written waiver. Trujillo complied with the investigator's request to remove his boots, and he gave them to the police as part of their investigation. The investigator then questioned Trujillo for over an hour about the events of the night before. The investigator testified that Trujillo claimed that he bought the microwave from "a wetback" at a bar early that morning. Trujillo testified that when the investigator accused him of the arson, he responded by requesting an attorney. It is undisputed that after Trujillo asked for an attorney the police officers ceased their questioning. An hour or so later, the police released Trujillo and, because he did not have his boots, Officer Chacon gave him a ride to a friend's house.

Seven weeks later, on January 14, 1988, Trujillo returned to the Alamosa County Jail after being apprehended in Arizona on an arrest warrant issued in this case. The next day, Investigator Lopez again advised Trujillo of his *Miranda* rights, and this time, Trujillo signed a written waiver of his rights. Trujillo testified that he did not ask for an attorney at this time because the investigator informed him that counsel

would be provided when he went to court later that day. The investigator questioned Trujillo in his cell for over 30 minutes regarding the microwave and the arson. According to the investigator, Trujillo recounted a story similar to the one he had given during the previous interrogation. He denied his involvement in the arson, but admitted that he may have received stolen property or committed burglary.

The trial court found that the police officers' initial contact with Trujillo while he was walking down the street with the microwave was not premised on "an articulable and specific basis in fact for suspecting that criminal activity has occurred or is about to occur." Accordingly, the court suppressed the microwave, the boots, and the first set of statements which Trujillo gave at the police station on November 25, 1987. The court also held that the second interrogation of Trujillo on January 15, 1988, was derivative of the first interrogation and was inadmissible as the fruit of the poisonous tree.

## II.

The district attorney contends that the police officers' initial contact with Trujillo on the street on November 25, 1987, was a constitutionally valid consensual interview. Trujillo claims that the police officers' conduct in surrounding him, questioning him, and transporting him to the police station for further questioning constituted a seizure which occurred in the absence of probable cause or an articulable suspicion of criminal activity and, thus, violated the Fourth Amendment safeguard against unreasonable search and seizure.

Case law has delineated three general categories of police-citizen encounters: 1) arrest, 2) investigatory stop, and 3) consensual interview. *See United States v. Black,* 675 F.2d 129, 133 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). The first, an arrest, is characterized by highly intrusive search or detention and must be justified by probable cause. *See, e.g., People v. Tufts,* 717 P.2d 485 (Colo.1986). *See generally* 1 W.

LaFave & J. Israel, *Criminal Procedure* § 3.3 (1984).

■ The second, an investigatory stop, "is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning" and must be justified by a reasonable, articulable suspicion that the person stopped is involved in criminal activity. *United States v. Black,* 675 F.2d at 133; *see also Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Hughes,* 767 P.2d 1201, 1203–04 (Colo. 1989). An investigatory stop must be justified by some objective manifestation, under the totality of the circumstances, that the person stopped was, is, or is about to be, engaged in criminal activity. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Under the three part test for a constitutionally permissible investigatory stop, the prosecution must establish that:

(1) there is an articulable and specific basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to occur; (2) the purpose of the intrusion is reasonable; and (3) the scope and character of the intrusion is reasonably related to its purpose.

*People v. Melgosa,* 753 P.2d 221, 225 (Colo. 1988).

The third type of police-citizen encounters, the consensual interview, "is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning." *United States v. Black,* 675 F.2d at 133; *see Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (police "do not violate the Fourth Amendment by merely approaching an individual on the street ... by asking him if he is willing to answer some questions...."); *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

■ In this case, the district attorney contends that the police did not need to have probable cause or a reasonable suspicion to stop Trujillo because the initial police contact with Trujillo was merely a con-

sensual interview and not an investigatory stop. The facts as found by the trial court do not support this view.

Officer Chacon stated that he had decided that he would "contact" the two men. He called for back-up cars, and the three cars approached and blocked the path of the two men, shining the vehicles' headlights in their eyes. Any reasonable person would have interpreted this conduct by police as requiring the two men to stop. The men were placed in a situation in which they were not free to disregard the police's request for questioning. As the trial court found, "the officers chose to approach the defendant and his companion in a manner that openly implied force." Trujillo himself testified that he thought that if he had not stopped and allowed the police to question him, he would have been arrested. It was not until after Trujillo was taken to the station and the police questioned his mother for a second time that Trujillo was finally told that he was "free to go." The trial court found that the police's conduct effected a seizure of Trujillo in the form of an investigatory stop, and the record amply supports this conclusion.

■ Our next inquiry is to determine whether the facts of this case meet the requirements for a permissible investigatory stop. Based on the testimony of Officer Chacon, it is clear that the police initially stopped Trujillo without any articulable basis to suspect that criminal activity was occurring. Trujillo merely looked at the police car and then handed a box to his companion and continued walking exactly as before. Neither of the two men engaged in any conduct which might have suggested criminal activity on their part. Cf. Terry v. Ohio, 392 U.S. at 23, 88 S.Ct. at 1881 (reasonable suspicion when defendants appeared to be "casing" shops). Officer Chacon himself testified that when the police stopped the two men, Trujillo acted "normal," and the officer stated that he did not have any report of criminal activity in the area at the time he encountered Trujillo.

The trial court found that Officer Chacon initially approached Trujillo merely on the basis of a subjective and unarticulated hunch, without the benefit of any specific facts to indicate that a crime had occurred. As this court has recognized, "A subjective and unarticulated hunch of criminal activity will not support the 'reasonable suspicion' necessary for an investigatory stop." *People v. Wells,* 676 P.2d 698, 701 (Colo.1984). We agree with the trial court that under the totality of the circumstances, the actions which the officer observed did not suggest criminal activity and did not rise to the requisite level of "an articulable suspicion."

Our holding is consistent with other cases which have dealt with the type of conduct that provides police with a reasonable suspicion to justify an investigatory stop. In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), police officers observed two men walking away from each other in an alley in an area which had a high incidence of drug traffic. The officers stopped one of the men because the situation "looked suspicious" and they had never seen the defendant in that area before. 443 U.S. at 47, 99 S.Ct. at 2637. The Supreme Court held that the defendant's Fourth Amendment rights were violated by the police's conduct because the officers lacked a reasonable suspicion, based on objective facts, that the defendant was involved in criminal activity. *Brown,* 443 U.S. at 52, 99 S.Ct. at 2641. Similarly, in *People v. Thomas,* 660 P.2d 1272 (Colo.1983), this court held that the defendant's act of putting his hand in his pocket and running when he saw the police was an ambiguous act which fell short of reasonable suspicion. Here, the shifting of a box from one person to another while walking down the street, without more, is an ambiguous gesture that does not imply criminal activity.

Because the initial stop was not constitutionally valid, the evidence uncovered by the prosecution as a direct result of the illegal stop must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Briggs,* 709 P.2d 911, 915 (Colo.1985). Accordingly, we affirm the order of the trial

court suppressing the microwave oven, the boots, and the statements Trujillo made at the police station on November 25, 1987.

### III.

The prosecution asserts that the second set of statements which Trujillo gave on January 15, 1988, was admissible because it was sufficiently removed from the statements he made at the previous illegal detention and was made after he waived his right to counsel. The first set of statements was obtained by Investigator Lopez at the station after the police stopped Trujillo on the street; the second set was obtained by Investigator Lopez after the police released Trujillo and then arrested him seven weeks later. Trujillo argues that the second set of statements was properly suppressed because it was tainted by his prior illegal detention and because his prior request for counsel was not honored. We will address each of these contentions in turn.

### A.

■ When the prosecution seeks to introduce a statement which the defendant alleges to be the product of a prior unlawful interrogation, the prosecution must meet the requirements of the derivative evidence rule. The rule requires that the prosecution "establish that the challenged evidence was obtained from an *independent source,* or that the connection between the initial illegality and the evidence has become so attenuated as to dissipate the initial taint." *People v. Lee,* 630 P.2d 583, 590–91 (Colo.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982) (emphasis added); *see also Harrison v. United States,* 392 U.S. 219, 225–26, 88 S.Ct. 2008, 2011–12, 20 L.Ed.2d 1047 (1968) (prosecution has burden to establish that defendant's statement was not product of prior illegally obtained statements); *People v. Founds,* 621 P.2d 325, 327 (Colo.1981).

■ In this case, the prosecution has met its burden of showing an independent source of evidence upon which to base its arrest and second interrogation of Trujillo. The prosecution presented testimony that,

on the night of the fire, Trujillo was in Jameel's Bar until it closed at about 1:30 a.m. Less than three hours later, the fire department discovered the fire at the Department of Social Services Building. At 8:00 a.m., Trujillo reappeared at Jameel's Bar carrying a microwave oven which he offered to sell to the bartender. Trujillo was seen carrying a baby doll at Jameel's Bar on the night of the fire, and the police found the baby doll at the alleged arson scene on the morning after the fire.

The trial court found that the witnesses and evidence which the police discovered through their investigation at Jameel's Bar were traceable to a source independent of Trujillo's first set of statements and we agree. Thus, the police had an adequate, independent basis for the arrest and subsequent interrogation of Trujillo in January, 1988, and the derivative evidence rule does not bar admission of Trujillo's statements.

### B.

■ We now consider whether the second set of statements should be suppressed because the police failed to provide Trujillo with an attorney pursuant to his request for counsel during the custodial interrogation which occurred seven weeks earlier. The Supreme Court has held that, once a defendant requests counsel during custodial police interrogation, all "interrogation must cease until an attorney is present." *Edwards v. Arizona,* 451 U.S. 477, 483, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (quoting *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966)); *see also Smith v. Illinois,* 469 U.S. 91, 99, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (per curiam); *People v. Cerezo,* 635 P.2d 197, 199 (Colo.1981).

The *Edwards* rule is designed to be a prophylaxis "to counteract the inherent pressures of custodial interrogation." *Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704 (1988); *see Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) (plurality opinion) (purpose of *Edwards* rule is "to protect an accused in police

custody from being badgered by police officers"). In light of the *Edwards* rule's remedial purpose in custodial questioning, several jurisdictions have declined to apply the *Edwards* rule in situations where a defendant has not been in continuous custody but is reinterrogated after being released from custody. *See Dunkins v. Thigpen*, 854 F.2d 394 (11th Cir.1988) (*Edwards* rule does not bar statements defendant made after interruption in custody), *cert. denied*, —— U.S. ——, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *United States v. Skinner*, 667 F.2d 1306 (9th Cir.1982) (same), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983); *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989) (same); *Brown v. State*, 661 P.2d 1024 (Wyo.1983) (same). We have found no authority to the contrary. We are persuaded that the release of the defendant, after the defendant has invoked his right to counsel while in police custody, ends the need for the *Edwards* rule because the defendant is no longer under the inherently compelling pressures of continuous custody. Accordingly, we hold that a defendant's request for counsel, made while in police custody and prior to his release, does not prohibit police interrogation at a later time provided that the defendant is properly advised of his rights before any subsequent interrogation. We emphasize, however, that this analysis will not apply if there is any indication that the release of the defendant was contrived, pretextual or done in bad faith. *See Dunkins*, 854 F.2d at 397 n. 6.

Applying this test to the case before us, we find that when Trujillo requested counsel, the interrogation ceased, and he was released from custody. The defendant does not contend that his release was contrived, pretextual or done in bad faith, and there is no evidence of such improper conduct. We conclude that, because Trujillo was not in continuous custody, his request for counsel does not extend through the second interrogation seven weeks later, and the *Edwards* rule does not bar admission of his statements.

### C.

The remaining consideration is whether Trujillo effected a valid waiver of his right to counsel when he gave the second set of statements to the police on January 15, 1988.

To establish a valid waiver of a defendant's right to counsel, the prosecution must show, by a preponderance of the evidence, that the defendant voluntarily, knowingly and intelligently waived his right to counsel. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *People v. Arguello*, 772 P.2d 87, 95 (Colo.1989). A court must indulge every reasonable presumption against finding a waiver of the right to counsel and any doubts regarding the waiver must be resolved in the defendant's favor. *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The validity of the waiver is determined from the totality of the circumstances, considering the particular facts and circumstances of each case, including the background, experience, and conduct of the defendant. *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023; *People v. Arguello*, 772 P.2d at 95; *People v. Pierson*, 670 P.2d 770, 775 (Colo.1983).

The Supreme Court has clarified that the key inquiry in determining whether the waiver of counsel during post-indictment questioning was "knowing and intelligent" is whether the accused was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forego the aid of counsel." *Patterson v. Illinois*, —— U.S. ——, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988). *Patterson* involved the post-indictment questioning of an accused in police custody under circumstances where the accused was properly advised of his *Miranda* rights, waived those rights in writing, and gave a lengthy incriminating statement to the police without at any time invoking his right to counsel. In *Patterson* the Court concluded that the giving of *Miranda* warnings before questioning a suspect provides a sufficient basis for accepting a waiver of the right to

counsel. *Id.* 108 S.Ct. at 2398; *see also North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) (an express statement can constitute a waiver of the right to counsel). The Court noted in *Patterson* that if the accused had indicated, after being advised of his *Miranda* rights, that he wanted the assistance of counsel, *Edwards* would have forbidden any further questioning unless initiated by the accused. 108 S.Ct. at 2394. Because Trujillo was not in continuous custody during the successive *Miranda* advisements, we have held that *Edwards* is not applicable and, for that reason, the *Patterson* decision provides the proper standard of waiver.

■ In the present case, the police gave Trujillo his *Miranda* warnings and Trujillo signed a written waiver of his rights before the police questioned him on January 15, 1988. A review of the record reveals no indication of pressure, manipulation, or overreaching exerted by the police on Trujillo during the interview, and indeed Trujillo does not contend that his statement was involuntary or coerced. In addition, as the trial court noted, Trujillo does not contend that the advisements given him were inadequate. Trujillo was told that he had the right to talk to a lawyer and have a lawyer present while he was being questioned, and that if he could not afford a lawyer, one would be appointed to represent him before any further police questioning took place. Trujillo knew from his experience in the station house seven weeks earlier that he could end the questioning by asking again to consult with a lawyer, but he elected not to do so.

Trujillo argues that he did not give a fully informed waiver of his right to counsel because the police did not tell him that his prior statement might not be admissible against him. The Supreme Court responded to a similar argument raised by the defendant in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), by holding that police need not provide this type of information in addition to the *Miranda* warnings because the imposition of such a requirement "is neither practicable nor constitutionally necessary." 470 U.S. at 316, 105 S.Ct. at 1296. In *Elstad* the Court found that the defendant's statement, given after a valid waiver of his *Miranda* rights, was admissible notwithstanding the police's failure to advise the defendant that a prior similar statement could not be used against him. *Id.* In this case, under the totality of the circumstances, there is no persuasive evidence in the record to refute the fact that Trujillo effected a voluntary, knowing, and intelligent waiver of his right to counsel when he signed the written waiver and responded to the investigator's questions.

For these reasons, we conclude that the trial court improperly suppressed the statements Trujillo made on January 15, 1988. Accordingly, we reverse the trial court ruling on this issue and remand for further proceedings consistent with this opinion. We affirm the trial court's ruling which suppressed the microwave, the defendant's boots, and the defendant's first set of statements.