The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Scott M. CASCIO and Craig M. Cascio,
Defendants–Appellees.

No. 96SA21.

Supreme Court of Colorado,
En Banc.

Feb. 24, 1997.

dence obtained during a warrantless search of Craig M. Cascio's van. The evidence was obtained after the defendants-appellees, Craig M. Cascio and Scott M. Cascio, were approached by deputies of the El Paso County Sheriff's Office because their van was parked illegally. Thereafter, the Cascios consented to a search of the van. The district court deemed the consent to be voluntary. The district court suppressed the evidence, however, because it found that the Cascios were illegally detained since the initial reason for the stop had been exhausted and there was no reasonable, articulable suspicion to detain the Cascios on other grounds. Therefore, the district court ruled that all of the evidence flowing from the illegal detention was subject to suppression as to both of the Cascios. In addition, the district court ruled orally that the passenger, Scott Cascio, did not have standing to challenge the search. By virtue of its written order, we presume that the district court ultimately determined that Scott Cascio did have standing to challenge the legality of the detention.

We hold that the contact between the deputies and the Cascios was a consensual interview. Thus, the Fourth Amendment was not implicated, and there was no illegal, unconstitutional detention. Accordingly, we reverse the district court's order and remand to that court for disposition consistent with our decision. Because we reverse the district court's order of suppression, we need not determine whether Scott Cascio has standing to challenge the search. The evidence is admissible against both the Cascios, and thus the standing issue is mooted.

John Suthers, District Attorney, Fourth Judicial District, David L. Geislinger, Deputy District Attorney, Colorado Springs, for Plaintiff–Appellant.

Daniel & Thom, P.C., Norman R. Thom, Colorado Springs, for Defendant–Appellee Scott M. Cascio.

Douglas P. Price, Colorado Springs, for Defendant–Appellee Craig M. Cascio.

Justice MULLARKEY delivered the Opinion of the Court.

The People filed this interlocutory appeal pursuant to C.A.R. 4.1 seeking review of the El Paso County District Court's order suppressing drug and drug paraphernalia evi-

I.

On July 22, 1995 between 8:00 and 9:00 p.m., Deputies Scott Rosenbaum and Mark Getskow of the El Paso County Sheriff's Office were patrolling the Rampart Range Road vicinity in Pike National Forest, Colorado, when they spotted the Cascios' white Ford van parked just off Rampart Range Road which at that location was an unpaved,

narrow mountain road.[1] The van was parked at the intersection of Rampart Range Road and a dirt road, described by the deputies as an old stage coach road. This road was closed to vehicular traffic by large boulders, and the van was parked a few feet away from the boulders.

As part of their duties, Deputies Rosenbaum and Getskow were empowered to enforce designated parking and camping signs posted along the roads they were patrolling. There were signs posted on Rampart Range Road stating that there was no parking on that road. The area in which the Cascios were parked was not designated for either parking or camping. Hence, the deputies parked their patrol car approximately ten to twenty feet[2] behind the van and trained their spotlight on the van. In addition, both deputies used their flashlights in order to see into the van. The deputies did not, however, activate the patrol car's overhead light bar.

Both deputies then approached the passenger side of the van on foot with Deputy Getskow positioned directly behind Deputy Rosenbaum. Deputy Getskow played a subsidiary role during the encounter and did not converse with the Cascios. All of the questions were posed by Deputy Rosenbaum. While approaching the van, Deputy Rosenbaum observed the passenger, Scott Cascio, dip down toward the floor of the vehicle.[3]

After warning the Cascios that they were in an area where parking and camping were not permitted, Deputy Rosenbaum asked the driver, Craig Cascio, if it was his van. Craig Cascio responded that it was his van. Deputy Rosenbaum then asked whether the Cascios had any weapons in the car. The Cascios answered in the negative. Deputy Rosenbaum requested and received permission from Craig Cascio to search the van for weapons. Deputy Rosenbaum asked the Cascios to get out of the van but did not conduct a pat down search of the Cascios. While Deputy Rosenbaum was conducting the search, Deputy Getskow took down the Cascios' names and dates of birth.

Deputy Rosenbaum's initial search revealed a gram of fine white powder on a business card on the van's dashboard and a hot propane torch located between the driver and passenger's seat.[4] His suspicions aroused by these items, Deputy Rosenbaum asked whether the Cascios were smoking crack cocaine. The Cascios did not respond to his question. At that point, Deputy Rosenbaum read the Cascios their rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Subsequently, when questioned as to its contents, Scott Cascio explained that the fine white powder was a combination of cocaine and methamphetamine. A field test confirmed the presence of cocaine and methamphetamine in the white powder.

Craig Cascio was charged with one count of possession of a Schedule II controlled substance in violation of sections 18–18–405(2)(a)(I), 18–8–204, 8B C.R.S. (1996 Supp.). Scott Cascio was charged with one count of possession of a Schedule II controlled substance with intent to distribute pursuant to sections 18–18–405(2)(a)(I), 18–8–204, 8B C.R.S. (1996 Supp.), and one count of tampering with physical evidence pursuant to section 18–8–610, 8B C.R.S. (1986 & 1996 Supp.).[5] Both defendants moved to suppress the evidence and statements obtained during

1. The United States Forest Service has a contract with the El Paso County Sheriff's Office to patrol Pike National Forest.

2. During the suppression hearing, Deputy Rosenbaum initially testified that they parked their patrol car 20 feet behind the van. Subsequently, Deputy Rosenbaum testified that they parked 15 feet behind the van. Deputy Getskow testified that they parked 10 feet behind the van.

3. The van's interior light was on, and its passengers were visible to the deputies.

4. Additional evidence was later uncovered by Deputy Rosenbaum during the course of his search including drugs, drug paraphernalia, and cash. However, the district court's order does not provide any details on this evidence. The testimony of the deputies during the suppression hearing is confusing, and, consequently, we cannot ascertain how the additional evidence was uncovered and in what order.

5. The tampering charge is not at issue in this interlocutory appeal.

their detention.[6] A joint suppression hearing was conducted by the district court. At the hearing, the court heard testimony from both deputies. Although Craig Cascio testified briefly in order to verify a picture of his van, and the picture was subsequently admitted into evidence, neither Craig nor Scott Cascio testified on the substantive issues before the court.

The district court treated the incident as a legitimate stop for a minor traffic infraction, finding that the deputies had reasonable grounds to believe that the Cascios were parked improperly and to question them about their intent to camp in that area. However, the district court found that the search for weapons was pretextual and that the consent to search was not viable because the purpose of the stop had been exhausted:

> [B]ased on the conduct of the officers in not searching the occupants' persons for weapons and in not otherwise securing the occupants for officer safety reasons, the Court finds that the request to search the van for weapons appears to have been a pretext. And although consent appears to have been voluntarily given, and the Court so finds, the Court does not find under *People v. Redinger*, 95SA168, 19 Brief Times Reporter 1544 (Colo.1995) and under *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994), that once the initial investigatory stop for camping or parking was concluded, there appeared to be no other articulated reasonable suspicion to support further investigation; therefore, no justification for continued detention and interrogation of the occupants of the vehicle.

■ Indeed, Deputy Getskow testified during the suppression hearing that, despite their comments to the Cascios, the search was conducted for drugs and not for weapons. Thus, the district court concluded that "the level of intrusion, given the facts and circumstances of this particular case, was beyond that permissible or warranted to a governmental official without further articulation of reasonable grounds to investigate the conduct of the occupants." [7] The district court was not convinced that Scott Cascio's motion of dipping down provided sufficient additional reasonable grounds to justify a continued detention.

The People filed this interlocutory appeal. Two issues are presented for our review: (1) whether the district court appropriately suppressed the evidence, and (2) whether the passenger, Scott Cascio, has standing to challenge the search of his brother's van. We do not reach the second issue because of our disposition of the first. Because the evidence is admissible, the issue of standing is rendered moot.

## II.

The Cascios argue that the evidence was unconstitutionally obtained because they were illegally detained at the time Deputy Rosenbaum requested consent to search. We disagree. We find that this police-citizen encounter does not rise to the level of an investigatory stop but, rather, was simply a consensual, everyday contact. Therefore, at the time the request for consent to search was made by Deputy Rosenbaum, the Cascios were not illegally detained. Furthermore, as discussed below, our holding in *People v. Redinger*, 906 P.2d 81 (Colo.1995), is not controlling. The district court adjudged the consent to be voluntary. Accordingly, the search was legitimate.

## A.

We first address the nature of the encounter between the Cascios and the sheriff's deputies.

■ The Fourth Amendment guarantees that "the right of the people to be secure in their persons, houses, papers, and effects,

---

6. The suppression of statements is not at issue here as the People conceded their suppression during oral arguments before the district court.

7. Although we reverse for other reasons, we note that the district court erred in its pretext analysis. As the United States Supreme Court has conclusively established, as long as the detaining officer has an objectively justified basis to detain an individual, the officer's subjective intent is irrelevant. *See Ohio v. Robinette*, —— U.S. ——, ——–——, 117 S.Ct. 417, 420–21, 136 L.Ed.2d 347 (1996); *Whren v. United States*, —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

against unreasonable searches and seizures, shall not be violated...." The United States Supreme Court has delineated three levels of police-citizen encounters which, as we stated in *People v. Johnson,* 865 P.2d 836, 842 (Colo.1994), have been consistently recognized and adopted by Colorado courts: (1) arrest; (2) investigatory stop; and (3) consensual interview. *See also People v. Trujillo,* 773 P.2d 1086, 1089 (Colo.1989). Each of these categories requires "varying levels of justification and protection." *People v. T.H.,* 892 P.2d 301, 303 n. 3 (Colo.1995). While an arrest and an investigatory stop constitute a seizure implicating the Fourth Amendment's safeguards, a consensual interview does not. *See generally* 4 Wayne LaFave, *Search & Seizure* § 9.3 (3d ed. 1996). Hence, the paradigm under which the circumstances fall has great bearing on whether or not the evidence is admissible. The Cascios do not argue that the encounter prior to their consent to the search constitutes an arrest. *See T.H.,* 892 P.2d at 303 n. 3 (an arrest is a "highly intrusive or lengthy search or detention that must be supported by probable cause of criminal activity"). Therefore, we must determine whether the interaction was an investigatory stop or a consensual encounter.

We are faced here with circumstances that present a close question and accentuate the sometimes subtle distinction between a consensual encounter and an investigatory stop. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court outlined the parameters of an investigatory stop which must be based on reasonable suspicion. In this context, the court explained that not all police-citizen encounters implicate the Fourth Amendment:

> [N]ot all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16; *see also People v. Hill,* 929 P.2d 735, 737–38 (Colo. 1996). The Fourth Amendment is not meant to preclude police-citizen contact, but, instead "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976).

We defined a consensual encounter in *People v. Thomas,* 839 P.2d 1174 (Colo.1992), as:

> [T]he voluntary cooperation of an individual to the non-coercive questioning by an officer. The individual is free to leave at any time during such an encounter, and, therefore, he is not "seized" within the meaning of the Fourth Amendment. The test for determining if the encounter is a consensual one is whether a reasonable person under the circumstances would believe he or she was free to leave and/or to disregard the official's request for information.

*Id.* at 1177–78 (citations omitted). The "free to leave" inquiry is modified when unrelated circumstances prevent the individual from leaving. *See Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (in a situation where the individual is not physically "free to leave," "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter"); *see also United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991) ("[A] driver is illegally detained only if the driver 'has an objective reason to believe that he was not free to end his conversation with the law enforcement official and proceed on his way.'") (quoting *United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990)).

■ In general, "[t]here can be no question that the stopping of a vehicle and the *detention of its occupants* constitute a 'seizure' within the meaning of the Fourth Amendment." *Colorado v. Bannister,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43 n. 3, 66 L.Ed.2d 1 (1980); *see also United States v. McSwain,* 29 F.3d 558, 562 n. 1 (10th Cir. 1994) (stressing the fact that the defendant was pulled over which would indicate " 'to a reasonable person that he was not at liberty to ignore the police presence and go about his business' ") (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. at 2387–88). Here, however, the Cascios were not pulled over by the

deputies as typically occurs in a routine traffic stop. Instead, the Cascios were already parked when the deputies spotted them, pulled in behind them, and walked to the van on foot. These circumstances are analogous to a situation in which a police officer who is on foot approaches a pedestrian on a sidewalk rather than a full-blown automobile stop. Thus, the question remains whether or not the initial interaction constituted a consensual encounter or an investigatory stop.

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, delivering the judgment of the court, fashioned the test for determining if there has been a seizure for Fourth Amendment purposes:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877 (citations and footnote omitted) (plurality opinion). Although only Justice Rehnquist joined this part of Justice Stewart's opinion in *Mendenhall*, the Supreme Court has subsequently adopted this test. *See INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) ("Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.").

In *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), the Supreme Court refined further what is meant by a reasonable person's perception that he or she is "free to leave" and stated that:

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Chesternut*, 486 U.S. at 573, 108 S.Ct. at 1979. The "free to leave" test is not dependent on the state of mind of the individual approached by the police, but, rather, on an objective standard, that of a reasonable person. *See id.* at 574, 108 S.Ct. at 1979–80. Moreover, the "inherent social pressure to cooperate with the police" does not elevate every police-citizen encounter into a seizure. *People v. Melton*, 910 P.2d 672, 676 (Colo. 1996).

In applying this contextual approach, courts have deemed the position of the patrol car relative to the motorist's vehicle an important consideration. In *United States v. Kim*, 25 F.3d 1426 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994), the Ninth Circuit Court of Appeals analyzed an encounter between the defendant, who was parked on a city street in Honolulu, and an agent with the Drug Enforcement Administration who parked his vehicle so as to partially block the defendant's egress. In concluding that the encounter was consensual, the court was "mindful that police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment." *Id.* at 1430. Nevertheless, the court held that where "officers come upon an already parked car, [the] disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense *ab initio*, except of his own volition." *Id.* The court then noted that, even though the officer partially

blocked the defendant's egress with.his automobile, that fact did "not alter [its] conclusion that [the defendant] was not stopped in the constitutional sense." *Id.* at 1431; *see also United States v. Angell,* 11 F.3d 806, 809 (8th Cir.1993) (finding the encounter consensual because the officer did not turn on the patrol car lights, did not block the pathway of the vehicle, did not draw a weapon, and did not physically touch the defendants), *cert. denied,* 512 U.S. 1239, 114 S.Ct. 2747, 129 L.Ed.2d 865 (1994); *United States v. Encarnacion–Galvez,* 964 F.2d 402, 410 (5th Cir.) (finding the encounter consensual because the agents made no display of authority, did not stop the defendant's vehicle but approached it on foot, and did not block the defendant's vehicle with the patrol car thus enabling the defendant to drive or walk away), *cert. denied,* 506 U.S. 945, 113 S.Ct. 391, 121 L.Ed.2d 299 (1992).[8]

In *United States v. Dockter,* 58 F.3d 1284 (8th Cir.1995), *cert. denied sub nom, Shulze v. United States,* —— U.S. ——, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996), the deputy on patrol spotted a vehicle parked off of the travelled portion of the road. The deputy did a U-turn and pulled in directly behind the vehicle. The deputy also activated the amber lights on his patrol car's light bar. The Eighth Circuit Court of Appeals concluded that there was no seizure because there was no behavior differentiating that encounter from one where an officer approaches a stranded motorist to offer assistance. *See id.* at 1287.

Conversely, if the police patrol car wholly blocks the defendant's ability to leave, courts have held that a reasonable person would not feel free to leave, so that the encounter cannot be adjudged consensual. *See United States v. Packer,* 15 F.3d 654, 657 (7th Cir. 1994) (noting that under circumstances where the officers' vehicles were parked both in front and behind the defendant's car with the "take down" lights shining, a reasonable person would not feel free to leave); *United States v. Lechuga,* 925 F.2d 1035, 1040 (7th Cir.1991) (placement of patrol cars in front and behind the detained motorist's vehicle constitutes an investigatory stop).

■ Here, the Cascios' egress was only slightly restricted by the deputies' patrol car with approximately ten to twenty feet between the two vehicles. Deputy Getskow testified that the Cascios would have been able to leave by maneuvering their van in a manner akin to parallel parking. Deputy Rosenbaum testified that it would not have been difficult for the van to leave because "there [was a] whole area to the east of where the [van was] parked where someone could get out or pull in." In fact, Deputy Rosenbaum explained that the tow truck driver, who removed the van, was able to pull in directly alongside the van. Therefore, the Cascios were not physically restrained from departing.

While this factor, standing alone, is not controlling, the totality of the circumstances surrounding the encounter between the Cascios and the sheriff's deputies does not support a finding that the encounter was an investigatory stop rather than a consensual encounter. Although there were two deputies present, they did not act in a threatening manner. *See United States v. Tavolacci,* 895 F.2d 1423, 1425 (D.C.Cir.1990) ("[T]he presence of two officers does not by itself transform a contact into a seizure."). In particular, the deputies did not display their weapons, physically touch the Cascios, surround the Cascios, or use an intimidating tone of voice. In fact, the colloquy between the parties was rather mild-mannered. Deputy Rosenbaum's approach was non-threatening. His greeting to the Cascios—"Hi guys. How are you doing?"—was casual and friendly. Deputy Rosenbaum testified that

---

8. Notably, in construing the significance of the position of the patrol car relative to a pedestrian-defendant, the United States Supreme Court has held that when an officer is in a patrol car pursuing a defendant who is on foot, that does not necessarily convey a message to the defendant that he is not free to leave or to disregard the police presence. *See Michigan v. Chesternut,* 486 U.S. 567, 575, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565 (1988) (holding that no seizure had occurred because the record did not "reflect that the police activated a siren or flashers; or that they commanded [the defendant] to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [the defendant's] course or otherwise control the direction or speed of his movement").

he pulled over with the intention of "contacting" the Cascios. Deputy Getskow testified that he and Deputy Rosenbaum "were told to investigate vehicles that were off the road, and that was basically for welfare checks, and so forth." Indeed, as we noted in *People v. Chaves,* 855 P.2d 852 (Colo.1993), police officers have various roles and multiple tasks in addition to those related to criminal offenses, including some that are civil in nature.[9] *See Chaves,* 855 P.2d at 855 (explaining that a police officer is a "jack-of-all emergencies").

Moreover, the Cascios did not answer all of the questions posed by Deputy Rosenbaum. Specifically, when Deputy Rosenbaum inquired if the Cascios had been smoking crack cocaine neither Craig nor Scott Cascio responded. The circumstances presented here are similar to those we recently considered in *People v. Hill,* 929 P.2d 735 (Colo.1996). In *Hill,* officers on foot patrol approached a vehicle parked in a parking lot, known for illegal activities, and asked the occupants some brief questions. We held that the encounter was a consensual interview that did not implicate the Fourth Amendment's safeguards.

We note that the deputies did use flashlights and activated their spotlight during their interaction with the Cascios. While we have recognized that the use of a spotlight can be a means of intimidation, there were no findings or implications here that the flashlights and spotlight were used in that manner or as weapons. *See Trujillo,* 773 P.2d at 1090 (by shining their patrol car's headlights into the eyes of the defendants and blocking the path of the defendants, the police officers imparted to the defendants by the use of implied force that they were not free to leave or disregard the police presence). Instead, the flashlights and spotlight were used as a

matter of practical necessity as the encounter took place when it was getting dark, and we do not attribute any significance to their use. *See People v. Dickinson,* 928 P.2d 1309, 1315 (Colo.1996) (an officer's "use of a flashlight to illuminate the interior of the vehicle [is] proper and [does] not implicate Fourth Amendment protections"). Significantly, the deputies did not deploy the patrol car's overhead light bar.

In short, the deputies' behavior was not "so intimidating as to demonstrate that a reasonable person would believe that he is not free to leave if he does not respond." *Hill,* at 737–38. Rather, the exchange was consensual because the Cascios' liberty was not restrained and their " 'voluntary cooperation ... [was] elicited through non-coercive questioning.' " *Johnson,* 865 P.2d at 842 (quoting *Trujillo,* 773 P.2d at 1089). Thus, "[a]side from the inherent pressure felt by any citizen to cooperate with law enforcement officers, the circumstances of this encounter were not so intimating as to communicate to [the Cascios] that [they were] not free to leave or to decline to respond." *Melton,* 910 P.2d at 677.

Because the encounter was consensual rather than a seizure, our holding in *People v. Redinger,* 906 P.2d 81 (Colo.1995), is not controlling. In *Redinger,* we held that once a police officer has lawfully pulled over a vehicle based on reasonable suspicion that the driver has committed a traffic infraction and discovers that no such infraction has taken place, that officer cannot, under Fourth Amendment principles, proceed to request the driver's license, registration, and proof of insurance. This court found that these routine requests comprised a constitutionally impermissible intrusion because, once "the purpose for which the investigatory

---

**9.** Deputy Rosenbaum's testimony indicates that he understood his function in the National Forest to be primarily civil in nature. He testified as follows:

> The Rampart Range/Pikes Peak service contract is by almost all descriptions, it's a one-community kind of touchy-feely kind of thing. No one goes up there and makes arrests with contacts. We're very polite people. We tell people to be careful with your fire. It's kind of like Smoky the Bear. We're very, very, polite

with people, and that's the way the Forest Service wants it. Very few arrests are made up there. It's more of a contact: Sir, are you aware that you are not supposed to park here.

And that's exactly what this situation was, and that's what my salutation to them was: How are you, [sic] guys, doing? Is everything okay? And, [d]id you know you weren't supposed to park here? If you are going to be further up the mountain, make sure you park in an area that says it's okay to park and camp.

stop was instituted has been accomplished and no other reasonable suspicion exists to support further investigation, there is no justification for continued detention and interrogation of citizens." *Id.* at 85–86 (footnote omitted). Here there was no Fourth Amendment seizure and, thus, contrary to the district court's holding, no illegal detention.

The People argue that once a police officer has lawfully contacted a citizen, there is no additional level of suspicion required to request the citizen's voluntary consent to search. The People cite *People v. Olivas,* 859 P.2d 211, 212 n. 1 (Colo.1993), as support for their broad argument. Because we do not find that the initial contact between the sheriff's deputies and the Cascios was an investigatory stop, *i.e.,* it was not initiated as an investigatory stop nor did it escalate to such a level before the point in time when the Cascios consented to a search, we do not address the People's argument.

### B.

■ A search without a warrant is presumptively unreasonable unless the search fits into one of the time-honored exceptions to the warrant requirement. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). One of these exceptions is a search conducted pursuant to consent. *See id; People v. Torand,* 622 P.2d 562, 565 (Colo.1981) ("A voluntary consent to search is a waiver of whatever right the consenting person had to prevent the police from searching."). Consent, however, must be voluntarily obtained in order to be viable. *See Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043–44; *People v. Licea,* 918 P.2d 1109, 1112 (Colo.1996).

In *Schneckloth,* the Supreme Court examined the meaning of voluntary consent and explained that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048; *see also Licea,* 918 P.2d at 1112 ("Voluntariness is to be assessed by considering the totality of the circumstances."). As we explained in *Licea,* a consent to search is voluntary if "it is 'the product of an essentially free and unconstrained choice by its maker' and not the result of circumstances where 'his will has been overborne and his capacity for self-determination critically impaired.'" *Licea,* 918 P.2d at 1112 (quoting *Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2046–47).

■ Here, the district court deemed the Cascios' consent to the search voluntary, and "[w]e must defer to the trial court's findings on the factual issue of voluntariness unless its findings are clearly erroneous." *Licea,* 918 P.2d at 1112. The record supports this finding. Specifically, the circumstances under which the consent was obtained do not undermine the voluntariness of that consent. Therefore, we do not disturb the district court's findings of voluntariness.

### III.

For all of the foregoing reasons, we reverse the order of the district court suppressing evidence obtained pursuant to a consensual search of Craig Cascio's van. We remand the case to the district court for further proceedings consistent with our decision.