The PEOPLE of the State of
Colorado, Petitioner,

v.

Derek Lavan JACKSON, Respondent.

No. 00SC688.

Supreme Court of Colorado,
En Banc.

Jan. 28, 2002.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Appellate Division Criminal Justice Section, Denver, CO, Attorney for Petitioner.

Cynthia Sheehan, Denver, CO, Attorney for Respondent.

Justice RICE delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' judgment in *People v. Jackson,* 13 P.3d 838 (Colo.App.2000).[1]

Defendant was a passenger in a car that was lawfully stopped for a traffic violation. The driver of the car produced a valid driver's license, registration, and proof of insurance. The police officer conducting the stop

---

1. We granted certiorari on the following issue: Whether police officers must always have reasonable suspicion in order to question passengers of a stopped vehicle, or whether under some circumstances such questioning should be viewed as a consensual interview.

also requested Defendant's identification. The only reason for this request was that Defendant was a passenger in the car; the police officer did not suspect that Defendant was engaged in any criminal activity. Then, instead of returning Defendant's identification, the police officer instructed Defendant to remain in the car while he ran his identification for warrants.

The court of appeals held that requesting Defendant's identification without reasonable suspicion constituted a seizure in violation of the Fourth Amendment. *Jackson,* 13 P.3d at 843. We disagree. Our precedent makes clear that, "A request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *People v. Paynter,* 955 P.2d 68, 70 (Colo.1998); *accord Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). The fact that Defendant was a passenger in a car stopped for a traffic violation does not alter this conclusion. "The detention of the passengers in a stopped vehicle is merely coincidental with the detention of the driver." *People v. H.J.,* 931 P.2d 1177, 1181 (Colo.1997). Thus, in this case, the police officer's request for identification did not implicate the Fourth Amendment. The officer's request merely initiated a consensual encounter, and therefore, Defendant was free to either ignore or decline the request.

However, when the officer retained Defendant's identification and instructed him to remain in the car while running the identification for warrants, what began as a consensual encounter escalated into an investigatory stop needing reasonable suspicion to justify it. Because the officer lacked the reasonable suspicion necessary to justify an investigatory stop, ordering Defendant to stay in the car while retaining his identification constituted a violation of Defendant's Fourth Amendment rights. Accordingly, we reverse in part and affirm in part.

## I. FACTS AND PROCEDURAL HISTORY

On October 24, 1997 at approximately 1:27 a.m., Defendant, Derek Lavan Jackson, was a passenger in a car being driven eastbound on Colfax Avenue. Officer Brant Harrold was on routine patrol heading westbound on Colfax. He observed that the car had only its parking lights on, not its headlights as required. *See* § 42–4–204, 11 C.R.S. (2001). Officer Harrold therefore signaled the vehicle to stop by turning on the overhead lights on his patrol car. The driver pulled the vehicle to the side of the road. Officer Harrold turned on his spotlight, aimed it at the driver's side-view mirror, and approached the driver's side of the car. After telling the driver why he had had been stopped, Officer Harrold requested to see the driver's license, registration, and proof of insurance. Still located on the driver's side of the car, Officer Harrold also asked Defendant if he had identification. Defendant said that he did and provided it to Officer Harrold.

Officer Harrold testified that the only reason he asked to see Defendant's identification is that Defendant happened to be a passenger in a car stopped for a traffic infraction. Defendant did not make any furtive gestures nor did Officer Harrold suspect that the vehicle had been stolen or involved in any crime other than the traffic infraction. Thus, Officer Harrold testified that he had no reason to believe that Defendant was armed or involved in any criminal activity whatsoever. Indeed, the trial court expressly found that Officer Harrold would have let Defendant leave the car and be on his way had he desired to do so. (R. at vol. IV, p. 19.)

At both the suppression hearing and at Defendant's trial, Officer Harrold testified that he requests passengers' identification as a matter of routine procedure and that his tone was conversational throughout his encounter with Defendant. Officer Harrold did not display a gun or weapon of any type and did not indicate in any way that Defendant was required to comply with his request for identification. In fact, the trial court found credible Officer Harrold's testimony that had Defendant declined the request compliance would not have been required. (R. at vol. IV, p. 19–20.)

After obtaining their identification cards, Officer Harrold told Defendant and the driver, "[H]ang tight in the car, I'll be back with

you in a minute." (R. at vol. IV, p. 9.) He then took their identification cards back to his patrol car and performed "a routine clearance check." (*Id.* at 5.) Officer Harrold testified that the purpose of this check was to ensure that the driver had a valid license and to see if either occupant had active warrants for their arrest. The check revealed that Defendant had three outstanding traffic warrants. Accordingly, Officer Harrold placed Defendant under custodial arrest. Approximately ten to fifteen minutes elapsed between the time Officer Harrold first contacted Defendant and when Defendant was taken into custody.

Subsequently, Officer Harrold transported Defendant to the Aurora City Jail in his patrol car. During the intake procedure, Officer Harrold discovered two small pieces of crack cocaine weighing .098 grams in Defendant's jacket. Defendant was later charged with possession of a controlled substance.

Defendant moved the trial court to suppress the cocaine seized from him as well as statements he had made to officers after his arrest as fruits of an illegal seizure. Viewing Officer Harrold's request for identification and Defendant's compliance therewith as a consensual encounter, the trial court denied this motion. Ultimately, the jury convicted Defendant of the charge, and Defendant appealed. The court of appeals reversed, holding that Officer Harrold violated Defendant's Fourth Amendment rights by asking for his identification without reasonable suspicion that he was engaged in criminal activity. We granted certiorari to consider whether police officers must always have reasonable suspicion in order to question passengers of a stopped vehicle, or whether under some circumstances such questioning should be viewed as a consensual interview.

## II. ANALYSIS

■ The Fourth Amendment to the United States Constitution provides that the people shall "be secure in their ... persons against unreasonable searches and seizures." U.S. Const. amend. IV. It is enforceable against the states through the Fourteenth Amendment. *Colorado v. Bannister*, 449 U.S. 1, 2, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980). "The Fourth Amendment does not proscribe all contact between police and citizens, but is designed 'to prevent arbitrary and oppressive interference with the privacy and personal security of individuals.'" *Delgado*, 466 U.S. at 215, 104 S.Ct. 1758 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)); *accord Paynter*, 955 P.2d at 71. The "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). "Reasonableness ... is measured in objective terms by examining the totality of the circumstances." *Id.* In applying this test, both this court and the United States Supreme Court have eschewed bright line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. *Id.; Outlaw v. People*, 17 P.3d 150, 155, 156 (Colo.2001) ("A totality of the circumstances analysis requires an examination of the behavior of the parties, as well as the physical, temporal, and social context of the encounter."); *Paynter*, 955 P.2d at 72–73.

■ Following the lead of the United States Supreme Court, Colorado has recognized three categories of police-citizen encounters: (1) arrests; (2) investigatory stops; and (3) consensual interviews. *Paynter*, 955 P.2d at 72; *People v. Morales*, 935 P.2d 936, 939 (Colo.1997). Arrests and investigatory stops are seizures and thus implicate the Fourth Amendment. *People v. Morales*, 935 P.2d 936, 939 (Colo.1997). They must therefore be justified by probable cause and reasonable suspicion respectively. Consensual encounters, on the other hand, are not seizures. *People v. Thomas*, 839 P.2d 1174, 1177 (Colo.1992). Instead, they are requests for cooperation, and because the Fourth Amendment proscribes only unreasonable searches and seizures, not voluntary cooperation, *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), consensual encounters do not implicate the Fourth Amendment. *Id.* Thus, the boundary between consensual encounters and investigatory stops is crucial because it defines where the protection of the Fourth Amendment begins.

We begin our analysis by reviewing the precedent from both the United States Supreme Court and this court that discusses the distinction between consensual encounters and investigatory stops. With this framework in mind, we then consider whether—and if so at what point—the encounter between Officer Harrold and Defendant rose to the level of an investigatory stop. Specifically, we analyze whether any of the following events occurring that evening constituted an unconstitutional seizure of the Defendant: (1) the stop of the vehicle; (2) the request for Defendant's identification; and (3) the retention of Defendant's identification coupled with Officer Harrold's instruction to Defendant to remain in the car.

 We note that at a suppression hearing, the defendant, as the moving party, has the burden of going forward. *Outlaw*, 17 P.3d at 155. "This burden requires the defendant to make two different showings: (1) the point at which he was 'seized' within the meaning of the Fourth Amendment; and (2) that the seizure was unconstitutional." *Id.* If the defendant satisfies these requirements, the burden of going forward then shifts to the prosecution. *Id.* The burden of proof, however, always remains with the prosecution. *Id.; see also People v. Canton*, 951 P.2d 907, 909 n. 3 (Colo.1998) ("When police detain a person without a warrant, the burden of proof is on the prosecution to prove the constitutional validity of the stop and any subsequent search.").

 We agree with the court of appeals that this case involves a mixed question of law and fact. *Jackson*, 13 P.3d at 841. Accordingly, we defer to the trial court's factual findings and will not set them aside unless they are clearly erroneous. *People v. D.F.*, 933 P.2d 9, 14 (Colo.1997). However, whether the facts found constitute an investigatory stop is a question of law. *Id.* We therefore review the trial court's conclusion that Defendant was not illegally seized de novo. *Id.*

## A. The Difference Between Consensual Encounters and Investigatory Stops

### 1. United States Supreme Court Precedent

Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) is perhaps the fountainhead of the Supreme Court's modern discourse on the distinction between consensual encounters and investigatory stops. In *Mendenhall*, the Court considered whether the defendant had been seized when federal drug enforcement agents approached her in an airport terminal and asked to see her identification and airline ticket. 446 U.S. at 547–48, 100 S.Ct. 1870. Justice Stewart joined by then Justice Rehnquist opined:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police, cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.")). Justice Stewart's test commanded a majority of the court in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). *See* 460 U.S. at 502, 103 S.Ct. 1319 (plurality opinion); 460 U.S. at 514, 103 S.Ct. 1319 (Blackmun, J., dissenting); 460 U.S. at 524, 103 S.Ct. 1319 (Rehnquist, J., dissenting.).

*Royer* involved facts similar to *Mendenhall*. Undercover agents approached the defendant in an airport terminal, identified

themselves, asked to see his identification and airline tickets, and then requested that he accompany them to a small room approximately forty feet away. *Royer*, 460 U.S. at 493–95, 103 S.Ct. 1319. The plurality reasoned that police officers do not violate the Fourth Amendment by merely identifying themselves as police officers, asking to see identification and travel documents, and simply posing questions to a citizen. *Id.* at 497, 103 S.Ct. 1319. It also made clear, however, that, "The person approached … need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Id.* Thus, the plurality determined that "[a]sking for and examining Royer's ticket and driver's license were no doubt permissible in themselves." *Id.* at 501, 103 S.Ct. 1319; *see also id.* at 524, 103 S.Ct. 1319 (Rehnquist, J., dissenting). However, the plurality nevertheless concluded that, based on the events subsequent to the initial questioning, a seizure had occurred. *Id.* at 501–02, 103 S.Ct. 1319. Important to the plurality's analysis was the fact that the officers did not return the defendant's airline ticket and identification before requesting that he accompany them to the "police" room:

> [W]hen officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, *while retaining his ticket and driver's license* and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave."

*Id.* (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (opinion of Stewart, J.)) (emphasis added).

*Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) appeared to broaden the category of consensual encounters even further. It considered whether a "factory survey" conducted by the Immigration and Naturalization Service effected a seizure of the factory's employees. The Court reiterated that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Id.* at 216, 104 S.Ct. 1758. Moreover, the Court reasoned that "while most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Id.* But where a person refuses to identify himself, and the police detain him to ascertain his identity, "the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Id.* at 216–17, 104 S.Ct. 1758. According to the Court, a seizure occurs if "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave." *Id.* Pursuant to this standard, the Court held that the factory's work force had not been seized within the meaning of the Fourth Amendment.

The Court articulated the test in a slightly different way to accommodate the factual circumstances of *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In *Bostick*, two uniformed officers boarded a bus and requested to inspect the defendant's ticket and identification. *Bostick*, 501 U.S. at 431, 111 S.Ct. 2382. Both were returned immediately as unremarkable, and the officers then asked to search the defendant's luggage. *Id.* at 431–32, 111 S.Ct. 2382. The defendant agreed, and drugs were found. *Id.* at 432, 111 S.Ct. 2382. The defendant argued that he was seized by the officers' questioning because a reasonable person would not have felt free to leave. *Id.* at 435, 111 S.Ct. 2382. Attempting to distinguish his case from the more "public" encounters at issue in *Mendenhall* and *Royer*, the defendant argued that an encounter on a bus is distinguishable from an encounter in an airport: the bus was cramped; the officers towered over him in his seat; and, given that the bus was about to depart, he would have risked being stranded and losing his luggage if he had disembarked. *Id.* The Florida Supreme Court found this argument persuasive and adopted a per se rule prohibiting the police from randomly boarding buses as a

means of drug interdiction. *Id.* The United States Supreme Court, however, held that defendant's and the state court's reliance on *Mendenhall* and *Royer's* "free to leave" language was misplaced:

> When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking. But when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter.

*Id.* at 435–36, 111 S.Ct. 2382. Instead, the Court reasoned that when a person's freedom of movement is "restricted by a factor independent of police conduct," the appropriate inquiry is whether, under the totality of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436, 111 S.Ct. 2382. Accordingly, the Court reversed the Florida Supreme Court's per se rule. *Id.* at 440, 111 S.Ct. 2382. It did not, however, decide whether a seizure had occurred, instead remanding the case for this purpose. *Id.* at 437, 440, 111 S.Ct. 2382.

■ In sum, the United States Supreme Court instructs that, "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439, 111 S.Ct. 2382. The test is objective, and presupposes an innocent person. *Whren v. United States,* 517 U.S. 806, 813–14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). It "is necessarily imprecise because it is designed to assess the coercive effect of police conduct, taken as a whole rather than to focus on particular details of that conduct in isolation." *Chesternut,* 486 U.S. at 573, 108 S.Ct. 1975.

## 2. Colorado Supreme Court Precedent

Our precedent is consistent with the Supreme Court's analysis. *See Paynter,* 955 P.2d at 72 ("[T]he test for determining if the encounter is a consensual one is whether a reasonable person under the circumstances would believe that he or she was free to leave and/or to disregard the official's request for information. This reasonable person test presupposes an innocent person. In applying the test, we rely upon an objective determination based on the factual circumstances surrounding the encounter.") (internal quotation marks and citations omitted); *People v. Rodriguez,* 945 P.2d 1351, 1359–60 (Colo. 1997); *People v. Cascio,* 932 P.2d 1381, 1385–86 (Colo.1997); *People v. T.H.,* 892 P.2d 301, 303 (Colo.1995); *People v. Johnson,* 865 P.2d 836, 842 (Colo.1994); *People v. Thomas,* 839 P.2d 1174, 1177–78 (Colo.1992); *see also People v. H.J.,* 931 P.2d 1177, 1180–81 (Colo. 1997). *Paynter* and *H.J.* are particularly instructive. They resolve specific issues in the case before us, and we therefore discuss them in depth.

In *H.J.,* the defendant was a passenger in a vehicle stopped for a traffic violation. *H.J.,* 931 P.2d at 1178. The driver could not produce valid registration or proof of insurance, and neither of the passengers claimed ownership of the vehicle. *Id.* at 1179. The officers therefore suspected that the car was stolen. *Id.* Accordingly, the officers asked both passengers for their names and dates of birth. *Id.* When the defendant provided confusing information regarding his name, the officers requested that all three occupants of the vehicle exit the car and sit on the curb. *Id.* Defendant was then handcuffed to investigate a possible false information charge. *Id.*

■ We began our analysis by distinguishing between the driver and passengers of a lawfully stopped vehicle. *Id.* at 1181. An officer causing a vehicle to pull over in transit is conducting an investigatory stop of the driver. *Id.* In a "full-blown" traffic stop, the driver is yielding to the officer's show of authority. The officer must therefore have reasonable suspicion that the driver is violating the law in some way to conduct such a stop. *Id.* If he does, he may compel the driver to produce identification and registra-

tion information in connection with that stop. *Id.;* § 16–3–103, 6 C.R.S. (2001) ("A peace officer may stop any person who he reasonably suspects is committing, has committed, or is about to commit a crime and may require him to give his name and address, identification if available, and an explanation of his actions.")

▮ In contrast to the constitutional seizure of the driver stopped for a traffic infraction, an officer need not have reasonable suspicion that the passengers of a vehicle are engaged in criminal activity in order to justify a stop of the vehicle. *H.J.*, 931 P.2d at 1182. "The detention of the passengers in a stopped vehicle is merely coincidental with the detention of the driver." *Id.* Therefore, in *H.J.*, the officers were required to have reasonable suspicion that the passengers were engaged in criminal activity, independent of the traffic infraction committed by the driver, before subjecting them to an investigatory stop. Because we concluded that the officers had reasonable suspicion that the car was stolen, and that the passengers were involved in stealing it, we held that it was permissible for the officers to detain and question the passengers. *Id.; see also People v. Cobb,* 690 P.2d 848, 852 (Colo.1984) (holding that police could detain occupants of a stopped vehicle, obtain their names and birth dates, and run check for outstanding warrants where police had reasonable suspicion that all three occupants were involved in criminal activity); § 16–3–103, 6 C.R.S. (2001). We did not consider whether the questioning itself effected a Fourth Amendment seizure, and we expressly reserved the question of whether police officers must always have reasonable suspicion in order to question passengers of a stopped vehicle, or whether under some circumstances such questioning would be viewed as a consensual interview. 931 P.2d at 1181 n. 8

In *Paynter,* the police officer approached two occupants of a parked car and, without any suspicion that they were engaged in criminal activity, asked for identification. 955 P.2d at 70. He then returned to his patrol car with the identification cards, and checked for outstanding warrants. *Id.* Upon learning that the defendant did indeed have an outstanding felony warrant, he was arrested, and drugs were found. *Id.* at 70–71.

The trial court held that there was no difference between a request for identification and a demand for identification, and thus concluded that the officer's request constituted a seizure of the defendant. *Id.* at 73. Reasoning that such a rule was "contrary to the Supreme Court's traditional contextual approach," we held that "the trial court erred when it concluded that a police officer's request for identification, alone, constitutes a seizure implicating Fourth Amendment protections." [2] *Id.* (internal quotation marks omitted). Instead of deciding ourselves whether a seizure had occurred, however, we remanded the case to the trial court and directed it to assess the Fourth Amendment implications of the encounter under the totality of the circumstances if it engaged in further proceedings. *Id.* at 76.

▮ Although we did not decide whether the defendant in *Paynter* had been seized, we did identify certain factors relevant to a determination of whether the circumstances surrounding an encounter between a police officer and an occupant of a vehicle are so

---

**2.** In concluding that a request for identification does not, by itself, constitute a seizure within the meaning of the Fourth Amendment, we were careful to distinguish the circumstances in *Paynter* from those in *People v. Padgett,* 932 P.2d 810 (Colo.1997). The defendant in *Padgett* began walking quickly away as two officers approached him and his companion. 932 P.2d at 812. The officers then required the defendant to alter his direction of travel, walk back to where the officers were, and, after obtaining his identification, told Padgett that he could leave only "if they did not have any warrants" on him. *Id.* at 812–13. "While the warrants check was in progress, which took between four and fifteen minutes to complete, [the defendant] repeatedly inquired why he was being detained and stated that he wanted to go home." *Id.* at 813. The officers responded that they would "have [the defendant and his companion] on their way if they didn't have any warrants." *Id.* at 814. We concluded that because a reasonable person under the circumstances would have construed the officer's statement as an instruction to stay, a seizure had occurred. *Id.; see also Outlaw,* 17 P.3d at 156 (seizure occurred where officers made a show of authority by closely following pedestrian defendant while in an automobile on a sidewalk and procuring a stop by requiring defendant to alter his direction of travel).

intimidating as to demonstrate that a reasonable, innocent person would not feel free to decline the officers' requests or otherwise terminate the encounter. *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382; *Delgado,* 466 U.S. at 217, 104 S.Ct. 1758. These factors include: (1) whether there is a display of authority or control over the defendant by activating the siren or any patrol car overhead lights; (2) the number of officers present; (3) whether the officer approaches in a non-threatening manner; (4) whether the officer displays a weapon; (5) whether the officer requests or demands information; (6) whether the officer's tone of voice is conversational or whether it indicates that compliance with the request for information might be compelled; (7) whether the officer physically touches the person of the citizen; (8) whether an officer's show of authority or exercise of control over an individual impedes that individual's ability to terminate the encounter; (9) the duration of the encounter; and (10) whether the officer retains the citizen's identification or travel documents. *Paynter,* 955 P.2d at 73–75. *Paynter* broke no new ground, and our Fourth Amendment jurisprudence is replete with examples of distinctions between consensual encounters and investigatory stops being made on the basis of these factors.[3]

The dissenting justices in *Paynter* agreed with the majority that the encounter was consensual when the officer asked the defendant for identification but felt that there was sufficient evidence in the record to permit the court to decide whether the defendant had been seized under the totality of the circumstances. *Id.* at 76 (Hobbs, J., concurring in part and dissenting in part). In their opinion "when [the officer] left [the defendant] and ... walked to his patrol car with their licenses to run a warrants check ... the encounter ceased to be consensual and escalated into a detention or seizure for Fourth Amendment purposes." *Id.* Thus, the officer's retention of the defendant's identification was crucial to the dissent's conclusion that a seizure had occurred. *Id.* at 76–78. Because of its decision to remand the case, the majority did not decide whether retention of the defendant's identification effected a seizure. In dicta, however, it acknowledged that "the sequence of events that occurs after a citizen voluntarily provides an officer his identification, including the length of time that the officer retains the identification card ... could result in such a restraint that a citizen is not free to leave." 955 P.2d at 75; *see also People v. Cervantes–Arredondo,* 17 P.3d 141, 148 (Colo.2001) (retention of license is an important factor in distinguishing between an investigatory stop and a consensual interview).

## III. APPLICATION

We hold that Defendant was not seized within the meaning of the Fourth Amendment when the vehicle in which he was a passenger was stopped for a traffic violation.

3. *See, e.g., People v. Morales,* 935 P.2d 936, 939–40 (Colo.1997) (holding that forty minute encounter was consensual because officers did not display force or do anything to restrain defendant's liberty where officers' tone was conversational throughout, officers merely requested to see the defendant's ticket and identification, did not manufacture delays or detain defendant, and were offering legitimate assistance to defendant); *People v. Cascio,* 932 P.2d 1381, 1387–88 (Colo. 1997) (holding that encounter was consensual interview because officers only slightly restricted defendants' egress; officers did not act in a threatening manner; officers did not display their weapons, did not physically touch the defendants, did not surround the defendants, and did not use an intimidating tone of voice); *People v. Melton,* 910 P.2d 672, 677 (Colo.1996) (holding that no seizure occurred where: the police officers approached defendant in non-threatening manner; the officers' guns were not drawn; they did not attempt to detain defendant; they

asked rather than demanded his name and address; and the initial encounter lasted only seconds); *People v. T.H.,* 892 P.2d 301, 303 (Colo. 1995) (holding that no seizure where officer approached defendant in a non-threatening manner, did not attempt to detain defendant, and requested, but did not demand, identification from defendant, and the entire encounter lasted only seconds); *People v. Johnson,* 865 P.2d 836 (Colo.1994) (holding that defendant standing in line at airport was not seized because neither officers' statements nor their conduct indicated that they exerted control or authority over defendant where police officers did not attempt to detain defendant (he was already detained in line), spoke in a conversational tone, asked rather than demanded to see defendant's ticket and identification, were not in uniform and did not display any weapons, did not retain defendant's identification or ticket, and the entire encounter lasted for only two or three minutes).

*H.J.*, 931 P.2d at 1181. We also hold that Defendant was not seized within the meaning of the Fourth Amendment when Officer Harrold requested his identification. *Paynter*, 955 P.2d at 76. However, we hold that when Officer Harrold retained defendant's identification while ordering him to stay in the car, a seizure occurred. *Cervantes–Arredondo*, 17 P.3d at 148; *Paynter*, 955 P.2d at 75–78; *Padgett*, 932 P.2d at 814. We now examine each of these propositions in more detail.

## A. Defendant Was Not Seized When The Car He Was Riding In Was Stopped For a Traffic Violation

 Our precedent recognizes that the flashing lights and overhead sirens used to effect a "full-blown" traffic stop are a display of authority and control indicative of an investigatory stop. *Paynter*, 955 P.2d at 73; *Cascio*, 932 P.2d at 1388. But a traffic stop is an investigatory stop of the driver; the display of authority and control is directed at the driver, not the passenger. *People v. O'Neal*, 32 P.3d 533, 538 (Colo.App.2000) ("Here, the police officer used his lights to stop the vehicle for a traffic violation, but that display of authority was clearly directed toward the driver."). It is the driver who yields to law enforcement's official authority. When a police officer pulls over a driver for a traffic infraction, the passenger is stopped too, but only coincidentally. The stop of the passenger is merely an unavoidable result of the driver's acquiescence in the police officer's command.

 Accordingly, although it may "strain credulity to imagine" that the driver of an automobile, "directly on the heels of having been pulled over to the side of the road by armed and uniformed police officers in marked patrol cars, would ever feel 'free to leave' or 'at liberty to ignore the police presence and go about his business,' " such is not the case with a passenger of an automobile. *H.J.* 931 P.2d at 1181 (quoting *Bostick* at 501 U.S. at 437, 111 S.Ct. 2382.) It is logical to conclude that a passenger of a car stopped for a traffic infraction would feel 'free to leave' or 'at liberty to ignore the police presence and go about their business' if they so choose. *People v. Cartwright*, 72

Cal.App.4th 1362, 85 Cal.Rptr.2d 788, 797 (1999) ("While we are all familiar with the sinking feeling a driver experiences upon seeing police lights in the rearview mirror, few of us sense impending doom when we are in the passenger seat. The passenger is not a participant in the stop, but an observer. And we are confident few feel fettered by the driver's problems."). Of course, the passenger's business may be with the driver, and the passenger may choose to wait, but it is this element of choice that distinguishes the passenger's circumstance from that of the driver's, for the driver has been seized and is therefore not free to go. Accordingly, the routine stop of a driver for a traffic violation does not implicate the Fourth Amendment rights of his passengers.

 In *H.J.*, we implicitly recognized that passengers, unlike drivers, are not seized within the meaning of the Fourth Amendment when we noted that an officer need not initially have reasonable suspicion as to all the occupants in the car and that the detention of passengers is merely coincidental with the detention of the driver. *H.J.*, 931 P.2d at 1181; *see also State v. Mendez*, 137 Wash.2d 208, 970 P.2d 722, 729 (1999) ("Stopping the car in which [the defendant] was a passenger did not effect a seizure of Mendez or other passengers. While the operator of a vehicle is seized when a police authority signals the operator to stop after a traffic infraction, the privacy rights of passengers in that stopped vehicle are not diminished by the stop.").

*H.J.* is consistent with the United States Supreme Court's decision in *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). In *Wilson*, the Court extended the rule of *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) to passengers, thus permitting officers to order passengers of a vehicle stopped for a traffic violation out of the car pending completion of the stop. *Wilson*, 519 U.S. at 410, 117 S.Ct. 882. It reasoned that the need for officer safety outweighed this minimal intrusion on the passenger. *Id.* at 413–15, 117 S.Ct. 882. It specifically declined, however, to hold that an officer may forcibly detain a passenger

for the entire duration of the stop, and, in the course of its opinion the Supreme Court implicitly recognized the constitutional distinction between passengers and drivers when a car is stopped by the police: "There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle." *Id.* When Officer Harrold stopped the driver of the car in which Defendant was riding for a violation of the traffic laws, Defendant was stopped too, "as a practical matter." *Id.* at 413, 117 S.Ct. 882. But it was the driver to whom Officer Harrold's show of authority and control was directed, not Defendant.[4] And thus, while this police conduct would have certainly communicated to a reasonable person in the driver's shoes that he was not free to decline the officers' requests or otherwise terminate the encounter, *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382, the same cannot be said of a reasonable person in Defendant's position. Accordingly, it was the driver, not Defendant, who was seized by the traffic stop itself.

 The incidental delay of a passenger stopped "as a practical matter ... by virtue of the stop of the vehicle" is not a seizure within the meaning of the Fourth Amendment. In fact, there was no "encounter" between Officer Harrold and Defendant until Officer Harrold requested Defendant's identification. We now consider whether this request subjected Defendant to a seizure within the meaning of the Fourth Amendment.

## B. A Request For Identification By The Police Does Not, By Itself, Constitute a Fourth Amendment Seizure

 Although we have concluded that the traffic stop did not itself implicate Defendant's Fourth Amendment rights, it is still a factor in determining whether the totality of the circumstances surrounding Officer Harrold's request for identification was so intimidating as to demonstrate that a reasonable, innocent person in Defendant's position would not have felt free to decline the officer's request or otherwise terminate the encounter. *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382; *Delgado,* 466 U.S. at 217, 104 S.Ct. 1758. Nevertheless, we hold that, under the totality of the circumstances, the officer's request initiated a consensual encounter because—leaving aside the inherent social pressure citizens feel to cooperate with the police—a reasonable, innocent person in Defendant's position would have felt free to decline the request or otherwise terminate the encounter.

Officer Harrold testified that he asks to see passengers' identification as a matter of routine procedure. He also testified that his tone of voice was conversational throughout his encounter with Defendant and that he did not indicate in any way that compliance with his request for Defendant's identification would have been compelled. In fact, the trial court found credible Officer Harrold's testimony that he would not have required compliance if Defendant had declined his request for identification. (R. at vol. IV, p. 19–20.) The trial court also expressly found that Officer Harrold would have let Defendant leave the car and be on his way had he desired to do so. (R. at vol. IV, p. 19.) These findings are supported by the record. *See D.F.,* 933 P.2d at 14.

Additional facts also support our conclusion that Officer Harrold's request for identification and Defendant's compliance therewith was a consensual encounter. First, Officer Harrold was the only officer present. He approached in a non-threatening manner. He did not display a weapon of any kind. The duration of the encounter up to the request was quite brief. He did not physically touch Defendant and did not impede Defendant's ability to terminate the encounter—either verbally or physically.[5]

---

4. For instance, in addition to the overhead lights, Officer Harrold trained his spotlight on the *driver's* side-view mirror.

5. The circumstances here are in this regard less intimidating than in *Bostick.* In *Bostick,* the

officers towered over the defendant while he was seated on the bus, impeding his egress therefrom. 501 U.S. at 435–36, 111 S.Ct. 2382. Here, Officer Harrold was standing on the driver's side of the car when he asked to see Defen-

And, as we have already pointed out, the trial court expressly found that Officer Harrold would have let Defendant leave the car and be on his way had he expressed a desire to do so. (R. at vol. IV., p. 19–20.)

 We acknowledge that this case is distinguishable from *Paynter* in that here, Officer Harrold used the overhead lights on his patrol car to effect a stop of the vehicle in which Defendant was riding. Moreover, we note that we have cited activation of a patrol car's siren or overhead lights as a factor relevant in determining whether a seizure has occurred. *See Paynter* 955 P.2d at 73. Activation of a patrol car's siren or overhead lights is relevant, we have explained, where it is a display of authority or control over the defendant indicating that he is not free to leave or otherwise terminate the encounter. *Id.* As we have already discussed, however, in a routine traffic stop, this display of authority and control is directed, not at the passenger, but at the driver.[6] It thus has little bearing on whether a reasonable passenger would feel free to decline a request for identification. *Cartwright,* 85 Cal. Rptr.2d at 792; *O'Neal,* 32 P.3d at 537–38. Moreover, the fact that flashing lights and overhead sirens are used to effect a "full-blown" traffic stop does not preclude a subsequent consensual interview with the driver, much less a passenger. *Cf. Thomas,* 839 P.2d at 1177–78 (The fact that a car is pulled over and an investigatory stop occurs does not preclude a subsequent consensual encounter between police officer and driver of the vehicle).

 Officer Harrold did not demand that Defendant produce his identification; he simply asked to see it. *See State v. Rankin,* No. 45696–2–I and No. 46739–5–I, 2001 Wash.App. LEXIS 2453, at *9, 108 Wash. App. 948, 33 P.3d 1090 (October 29, 2001) ("The inquiry then is whether the officers in each case merely requested identification, or whether they required it. The former is permissible, the latter is not."). This was nothing more than a non-compulsory request for cooperation with which Defendant voluntarily chose to comply. *See People v. Johnson,* 865 P.2d 836, 842 (Colo.1994) ("A consensual encounter consists of the voluntary cooperation of an individual to the non-coercive questioning by an officer."); *accord Thomas,* 839 P.2d at 1177–78. As the trial court found, he could have declined the request and been on his way.[7] *See People v. T.H.,* 892 P.2d 301, 303 (Colo.1995) ("The person approached [in a consensual interview] . . . need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way."). The fact that Defendant chose to comply, and did so without being told that he was free not to, "hardly eliminates the consensual nature" of the compliance. *Delgado,* 466 U.S. at 216–17, 104 S.Ct. 1758; *see also Cascio,* 932 P.2d at 1386 ("The inherent social pressure to cooperate with the police does not elevate every police-citizen encounter into a seizure.") (internal quotation marks omitted); *Melton,* 910 P.2d at 676 ("[A] police-citizen encounter does not become a seizure simply because citizens may feel an inherent social pressure to cooperate with police."). " 'A request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.' " *Paynter,* 955 P.2d at 70 (quoting *Delgado,* 466 U.S. at 216, 104 S.Ct. 1758). The fact that Defendant happened to be in a car stopped for a traffic violation does

---

dant's identification and thus not preventing Defendant from exiting the vehicle via the passenger door.

6. Similarly, in a routine traffic stop, the typical relevance of a patrol car's position in relation to a stopped vehicle is whether the position displays control or authority over the driver of the vehicle such that the driver would not feel free to drive the vehicle away.

7. Since Defendant did not attempt to exit the vehicle and leave the scene, we do not consider whether the need for officer safety would have permitted Officer Harrold to require Defendant to remain at the scene. *See Wilson,* 519 U.S. at 415, 117 S.Ct. 882 (refusing to decide whether an officer may forcibly detain a passenger for the entire duration of the stop). *Compare People v. Gonzalez,* 184 Ill.2d 402, 235 Ill.Dec. 26, 704 N.E.2d 375 (1998) (ordering passenger to return to car is not an unconstitutional seizure within the meaning of the Fourth Amendment) *with State v. Mendez,* 137 Wash.2d 208, 970 P.2d 722 (1999) (ordering passenger to get back into car is an unconstitutional seizure within the meaning of the Fourth Amendment).

not alter this conclusion. Faced with comparable circumstances, the court of appeals in *O'Neal* concluded:

> Here, the police officer used his lights to stop the vehicle for a traffic violation, but that display of authority was clearly directed toward the driver. This is a common occurrence in everyday life and was no more or less intimidating to defendant than if the police officer had approached him on foot, a situation that has been repeatedly held to constitute a consensual encounter. If defendants in the situations described in *Bostick, Morales,* and *Paynter* could feel free to decline the officer's request for identification, then defendant here, in less intimidating circumstances, also could.

*O'Neal,* 32 P.3d at 538. We agree. Consequently, considering the totality of the circumstances, we conclude that the circumstances surrounding Officer Harrold's request for Defendant's identification were not so intimidating as to demonstrate that a reasonable, innocent person would not feel free to decline the officers' requests or otherwise terminate the encounter. *Bostick,* 501 U.S. at 439, 111 S.Ct. 2382; *Delgado,* 466 U.S. at 217, 104 S.Ct. 1758. Accordingly, Officer Harrold's request for identification and Defendant's compliance therewith was not a seizure, but a consensual interview, and thus did not implicate Defendant's Fourth Amendment rights. We therefore reverse the court of appeals' judgment to the contrary.

**C. Retaining Defendant's identification and ordering him to stay in the car while checking to see if he had any outstanding warrants constituted a seizure.**

 Notwithstanding our conclusion that Officer Harrold's request for identification did not implicate Defendant's Fourth Amendment rights, what began as a consensual encounter escalated to an investigatory stop when Officer Harrold ordered Defendant to remain in the car while returning to his patrol car with Defendant's identification. We, along with the United States Supreme Court, the federal appellate courts, and a number of other states, have recognized that whether an officer retains a defendant's identification is a critical factor in distinguishing, under the totality of the circumstances, a consensual encounter from an investigatory stop. *See, e.g., Cervantes–Arredondo,* 17 P.3d at 148 (holding that questioning of a driver stopped for a traffic violation cannot be construed as consensual until license and registration are returned); *Paynter,* 955 P.2d at 75 ("We recognize that the sequence of events that occurs after a citizen voluntarily provides an officer his identification, including the length of time that the officer retains the identification card ... could result in such a restraint that a citizen is not free to leave. In such a case, subsequent facts might convert a consensual encounter into a seizure."); *Paynter,* 955 P.2d at 76–78 (Hobbs, J., concurring in part and dissenting in part) ("[W]hen [the officer] left [the defendant] and his companion and walked to his patrol car with their licenses to run a warrants check ... the encounter ceased to be consensual and escalated into a detention or seizure for Fourth Amendment purposes."); *see also Royer,* 460 U.S. at 501–02, 103 S.Ct. 1319 (plurality opinion); *United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995) ("What began as a consensual encounter quickly became an investigative detention once the agents received [the defendant's] driver's license and did not return it."); *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) ("This Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."); *United States v. Jordan,* 951 F.2d 1278, 1282 (D.C.Cir.1991) ("[O]nce the identification is handed over to the police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it."); *United States v. Savage,* 889 F.2d 1113, 1117 n. 3 (D.C.Cir. 1989) ("[F]ailing to return a traveler's ticket after sufficient time to peruse it had elapsed [may] be tantamount to a detention" if it prevents a traveler "from going about his 'ordinary business.' "); *United States v. Thompson,* 712 F.2d 1356, 1359 (11th Cir.

1983) ("When [officer] retained [the defendant's] license, the encounter matured into an investigative stop protected by the Fourth Amendment."); *United States v. Waksal*, 709 F.2d 653, 660 (11th Cir.1983) (describing police officers' failure to return a detainee's ticket and license as "highly material in analyzing" whether police conduct amounted to a seizure.); *Piggott v. Commonwealth*, 34 Va. App. 45, 537 S.E.2d 618, 619 (2000) ("[The officer's] request for [the defendant's] identification initiated a consensual encounter and implicated no Fourth Amendment interest. However, the consensual aspect of the encounter ceased when [the officer] retained [the defendant's] identification while he ran a warrant check. A reasonable person in [the defendant's] circumstances would not have believed that he could terminate the encounter and walk away."); *Richmond v. Commonwealth*, 22 Va.App. 257, 468 S.E.2d 708, 709–10 (1996) (same); *State v. Thomas*, 91 Wash.App. 195, 955 P.2d 420, 423 (1998) ("Once an officer retains the suspect's identification and takes it with him to conduct a warrants check, a seizure within the meaning of the Fourth Amendment has occurred.").

Here, Defendant chose to comply with Officer Harrold's consensual request for identification. This choice did not implicate the Fourth Amendment. But when Officer Harrold took Defendant's identification, ordered him to stay in the car, and, without asking, returned to his patrol car with it,[8] a reasonable person in Defendant's shoes would no longer have felt free to leave or otherwise terminate the encounter. *See Paynter*, 955 P.2d at 75 ("[T]he sequence of events that occurs after a citizen voluntarily provides an officer his identification, including the length of time that the officer retains the identification card ... could result in such a restraint that a citizen is not free to leave."); *Id.* at 77; *see also United States v. Jordan*, 958 F.2d at 1087 ("[A]bandoning one's driver's license ... is simply not a practical or realistic option for a 'reasonable' traveler in this day and age."); *Jordan*, 951 F.2d at 1282 ("[O]nce the identification is handed over to police and they have had a reasonable oppor-

tunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it."); *Richmond*, 468 S.E.2d at 710 ("A reasonable person in appellant's circumstances would not believe that he could terminate the encounter once the officer retained the driver's license and returned to his police vehicle to run a record check.").

We acknowledge that many cases have concluded that the reason retaining a defendant's drivers license or travel ticket implies a seizure is because one cannot legally drive a car without a driver's license or board a bus, train, or plane, without a ticket. *See e.g., Jordan*, 958 F.2d at 1088. Here, in contrast, Defendant would not have violated any law by leaving the scene without his identification. However, we find this to be a superficial distinction. The need for identification is pervasive in today's society, and a reasonable person would not consider abandoning his identification a practical option. Thus, even though Defendant's identification was not technically or legally required to leave the scene, as a practical matter, a reasonable person in his position would not have felt free to leave without it. *See United States v. Lambert*, 46 F.3d at 1068 ("[The defendant] would not reasonably have felt free to leave or otherwise terminate the encounter with the agents because his driver's license had not been returned to him. While we agree with the government that [the defendant] could have left the airport by plane, taxi, or simply walking down the street, as a practical matter he was not free to go.").

However, we do not rely exclusively on Officer Harrold's retention of Defendant's identification in concluding that a seizure occurred. What was implicit in Officer Harrold's retention of Defendant's identification—that Defendant was not free to leave—was made explicit by Officer Harrold's statement accompanying that retention. Upon obtaining Defendant's identification, Officer Harrold instructed Defendant to "hang tight

---

8. The record does not indicate precisely how long Officer Harrold held Defendant's identification before he was arrested. Officer Harrold did

testify, however, that it was approximately ten to fifteen minutes from the time he initiated the traffic stop to the time Defendant was arrested.

in the car" and told him that he would be back with him in a minute. (R. at vol. IV, p. 9.) Unlike Officer Harrold's request for identification, which was consensual in nature, this statement was a command phrased in mandatory terms. *See Padgett*, 932 P.2d at 814 (holding a seizure had occurred where officer told the defendant and his companion that he would "have them on their way if they didn't have any warrants" because a reasonable person under the circumstances would have construed the officer's statement as an instruction to stay); *State v. Ellwood*, 52 Wash.App. 70, 757 P.2d 547, 549 (1988) (holding that "wait right here" is a command constituting a seizure); *see also Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (listing use of language by a police officer that signifies compliance with his request might be compelled as an example of a circumstance that might indicate a seizure). Thus, regardless of his conversational tone, Officer Harrold's choice of words indicated that compliance with the order might be compelled and that Defendant was not free to go.[9] Under the totality of the circumstances, therefore, a reasonable person in Defendant's position would not have felt free to leave or otherwise terminate the encounter once his identification was retained and he was ordered to remain in the car while Officer Harrold checked to see if Defendant had warrants outstanding. At this point, a seizure occurred. Accordingly, because Officer Harrold did not possess the reasonable suspicion necessary to justify an investigatory stop, the cocaine found was the fruit of an illegal seizure, and as such, must be suppressed. *See People v. Rodriguez*, 945 P.2d 1351, 1363–65 (Colo.1997). We therefore affirm the court of appeals' judgment on this point.

## IV. CONCLUSION

Our precedent makes clear that, "A request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Paynter*, 955 P.2d at 70. The fact that Defendant was a passenger in a car stopped for a traffic violation does not alter this conclusion. "The detention of the passengers in a stopped vehicle is merely coincidental with the detention of the driver." *People v. H.J.*, 931 P.2d 1177, 1181 (Colo. 1997). Thus, in this case, under the totality of the circumstances, the police officer's request for identification did not implicate the Fourth Amendment. It merely initiated a consensual encounter, and therefore, Defendant was free to either ignore or decline the request.

However, when the officer retained Defendant's identification and instructed him to remain in the car while running the identification for warrants, what began as a consensual encounter quickly escalated into an investigatory stop needing reasonable suspicion to justify it. Because the officer lacked the reasonable suspicion necessary to justify an investigatory stop, ordering Defendant to stay in the car while retaining his identification constituted a violation of Defendant's Fourth Amendment rights. Accordingly, we reverse in part and affirm in part and remand this case for further proceedings consistent with this opinion.

9. Defendant was not ordered to stay in the car for Officer Harrold's protection, but so Officer Harrold could check for outstanding warrants. Accordingly, the extent to which the need for officer safety would justify controlling the movement of passengers at the scene of a traffic stop beyond that permitted by *Wilson* is not before us. Certainly, we agree with the United States Supreme Court that the need for officer safety is both "legitimate and weighty." *Wilson*, 519 U.S. at 412, 117 S.Ct. 882 (quoting *Mimms*, 434 U.S. at 110, 98 S.Ct. 330).