1
 2025 CO 25 The People of the State of Colorado, Plaintiff-Appellant v. Oscar Jonas Ganaway. Defendant-Appellee No. 24SA244
Supreme Court of Colorado, En Banc
May 27, 2025

 Interlocutory Appeal from the District Court Arapahoe County
 District Court Case No. 22CR505 Honorable David N. Karpel,
 Judge

 ORDER

 Attorneys for Plaintiff-Appellant: John Kellner, District
 Attorney, Eighteenth Judicial District L. Andrew Cooper,
 Deputy District Attorney Centennial, Colorado

 Attorneys for Defendant-Appellee: Law Firm of Heather Little,
 LLC Heather Little Durango, Colorado

 JUSTICE BOATRIGHT delivered the Opinion of the Court, in
 which CHIEF JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE
 HART, and JUSTICE SAMOUR joined. JUSTICE BERKENKOTTER, joined
 by JUSTICE GABRIEL, dissented.

 OPINION

 BOATRIGHT, JUSTICE.

 ¶1
 While conducting an operation to arrest Anthony Veloz at a
 motel, the police encountered Oscar Jonas Ganaway walking
 toward the motel. An officer asked Ganaway where he was
 going, and Ganaway pointed to Veloz's motel room. A
 detective then asked Ganaway if he could pat him down for
 weapons, and Ganaway said, "No problem." During the
 patdown, the detective found methamphetamine and arrested
 Ganaway. Ganaway later moved to suppress the seized evidence.
The trial court granted the motion, finding that the initial
 encounter was a seizure, and therefore, the evidence arising
 from the search must be suppressed. The People appealed the
 trial court's order under section 16-12-102(2), C.R.S.
(2024), and C.A.R. 4.1.

 ¶2
We now hold, based on the totality of the circumstances, that
 the initial encounter between the police and Ganaway was not
 a seizure, meaning it did not trigger Fourth Amendment
 protections. We further hold that Ganaway voluntarily
 consented to the patdown. Accordingly, we reverse the trial
 court's suppression order and remand the case for further
 proceedings consistent with this opinion.

 I.
Facts and Procedural History

 ¶3
 Uncontroverted testimony at the suppression hearing
 established the following facts.

 ¶4
 The Denver Police Department ("DPD") suspected
 Veloz of supplying drugs that had been smuggled into the
 Denver City Jail. Veloz's parole officer, Officer
 DeHerrera, knew that Veloz was staying at a motel in
 Glendale, Colorado. On the way to the motel to execute an
 arrest warrant, DPD Detective Foster called the Glendale
 Police Department ("GPD") investigations unit to
 ask for assistance. Ultimately, a group of seven or eight
 officers gathered at the motel: Officer DeHerrera, two DPD
 detectives, and four or five GPD detectives.[1] They all wore
 badges and plain clothes under tactical, ballistic vests with
 conspicuous lettering that read "POLICE." They also
 carried firearms that were covered by their clothing.

 ¶5
 The group gathered out of sight from Veloz's room, on the
 south side of the motel parking lot. The plan was for Officer
 DeHerrera to knock on the door to Veloz's room from the
 exterior of the building, as the motel rooms are all
 accessible via outdoor hallways, or "breezeways."
As the police were approaching the building, walking toward
 the breezeway, Ganaway parked his Hyundai about sixty feet in
 front of them, exited the car, and began walking toward them.
The police stopped moving.

 ¶6
 Ganaway continued walking toward the group. He was looking
 down at the ground and not paying attention to his
 surroundings. When Ganaway was about twenty feet away,
 Officer DeHerrera asked him where he was going. Ganaway
 pointed to Veloz's room. He appeared shocked to see the
 police and began clutching the pockets of his pants and
 sweatshirt. There seemed to be a large object weighing down
 his sweatshirt pocket.

 ¶7
 Concerned that Ganaway was armed, Detective Foster said to
 Ganaway (who was still about twenty feet from the group),
 "I'd like to pat you down for weapons, if that's
 okay." Ganaway responded, "no problem"; he put
 his hands out to the side, turned around, and walked
 backwards toward Detective Foster. No one requested or
 commanded Ganaway to approach in that manner. The officers
 remained in place in a line, which Detective Foster stepped
 out of, though he did not advance toward Ganaway. Ganaway
 continued walking backwards until Detective Foster said,
 "That's good," at which point the two of them
 were about a foot apart from each other.

 ¶8
 Preparing to conduct the patdown, Detective Foster visually
 scanned Ganaway's body. Ganaway's sweatpants pockets
 were hanging open, and Detective Foster saw a plastic bag
 protruding out of his pocket; the bag contained
 semi-translucent crystalline shards of what he suspected to
 be methamphetamine. Detective Foster proceeded with the
 patdown, and as he ran his hand over the

 pocket containing the plastic bag, he felt a crunch, which
 based on his experience as a police officer, he identified as
 consistent with the texture of methamphetamine shards.
Ganaway did not possess a weapon on his person. Detective
 Foster took the plastic bag for evidence and arrested
 Ganaway. Detective Foster then passed Ganaway to Detective
 Traudt and other GPD personnel.

 ¶9
 Detective Traudt searched Ganaway incident to his arrest,
 locating a Hyundai key fob. Detective Traudt advised Ganaway
 of his Miranda rights. Ganaway stated that he
 understood those rights and wanted to talk. Ganaway explained
 that he had been previously convicted of drug felonies which
 resulted in him serving a few years in prison. Detective
 Traudt asked whether Ganaway had any firearms on him or in
 his car. Ganaway responded that he had a firearm in his car
 and that he knew he was not supposed to possess a gun but did
 so for his personal safety. Detective Gonzalez asked Ganaway
 if they could search his car, and Ganaway consented. The
 police subsequently searched the car and discovered the
 firearm that Ganaway had mentioned.

 ¶10
The People charged Ganaway with unlawful possession of a
 controlled substance, § 18-18-403.5, C.R.S. (2024),
 possession of a weapon by a previous offender, §
 18-12-108, C.R.S. (2024), and a special offender count,
 § 18-18-407, C.R.S. (2024). Ganaway moved to suppress
 his statements and the evidence.

 ¶11
 At the suppression hearing, the trial court made factual
 findings consistent with the testimony of Detectives Foster
 and Traudt. The court, however, made two additional critical
 findings of fact, which it used to support its legal
 conclusions: (1) "the officers surrounded
 [Ganaway]" in tactical gear and altered his direction of
 travel when he arrived near Veloz's door; and (2) the
 officers asked Ganaway to "come with us . . . and
 describe where you [are] going" when he pointed to
 Veloz's door.

 ¶12
The court then found that the record "does not support
 an existence of a consensual encounter." It further
 found that the officers lacked reasonable articulable
 suspicion that Ganaway was committing or about to commit a
 crime. Consequently, it granted Ganaway's motions to
 suppress. The People filed this interlocutory
 appeal.[2]

 II.
Analysis

 ¶13
The People argue that (1) Ganaway's initial encounter
 with the police was not a Fourth Amendment
"seizure," and (2) Detective Foster's patdown
 search was permissible because Ganaway voluntarily consented
 to it. To resolve these issues, we begin by identifying the
 applicable standard of review. Next, we

 analyze whether either Officer DeHerrera's initial
 question to Ganaway, or Detective Foster's subsequent
 patdown, violated Ganaway's Fourth Amendment rights. We
 hold, based on the totality of the circumstances, that the
 initial encounter between the police and Ganaway was not a
 seizure, meaning it did not trigger Fourth Amendment
 protections. We further hold that Ganaway voluntarily
 consented to the patdown. Accordingly, we reverse the trial
 court's suppression order and remand the case for further
 proceedings consistent with this opinion.

 A.
Standard of Review

 ¶14
 A trial court's order regarding a motion to suppress
 presents a "mixed question of fact and law."
People v. Dacus, 2024 CO 51, ¶ 23, 559 P.3d
 198, 203. We defer to "the trial court's findings of
 historical fact . . . if they are supported by competent
 evidence in the record." People v. McDaniel,
 160 P.3d 247, 250 (Colo. 2007) (quoting People v.
 McClain, 149 P.3d 787, 789 (Colo. 2007)). If the trial
 court's factual findings are "so clearly erroneous
 as not to find support in the record," they must be set
 aside. People v. Schrader, 898 P.2d 33, 36 (Colo.
1995) (quoting People v. Johnson, 653 P.2d 737, 740
(Colo. 1982)). Thus, a trial court's ultimate legal
 conclusion that is "unsupported by evidentiary findings
 is subject to correction on review." People v.
 Miranda-Olivas, 41 P.3d 658, 661 (Colo. 2001) (citing
People v. Gennings, 808 P.2d 839, 847 (Colo. 1991)
(reversing a suppression order because

the trial court's findings were "not adequately
 supported in the record")). In reviewing a trial
 court's ruling on a motion to suppress, "we look
 solely to the record created at the suppression
 hearing." People v. Thompson, 2021 CO 15,
 ¶ 16, 500 P.3d 1075, 1078.

 B.
Fourth Amendment Seizures

 ¶15
 The Fourth Amendment of the Constitution protects citizens
 from unreasonable searches and seizures. U.S. Const. amend.
 IV. "When the police 'seize' a citizen, they
 must comply with those protections. Not every interaction
 with the police, however, is a seizure." People v.
 Taylor, 2018 CO 35, ¶ 8, 415 P.3d 821, 824. Arrests
 and investigatory stops are seizures and therefore implicate
 the Fourth Amendment. People v. Brown, 2022 CO 11,
 ¶ 15, 504 P.3d 970, 975. However, "[c]onsensual
 encounters are not seizures . . . and do not implicate the
 Fourth Amendment." Taylor, ¶ 8, 415 P.3d
 at 824 (alteration and omission in original) (quoting
People v. Marujo, 192 P.3d 1003, 1006 (Colo. 2008)).

 1.
Defining a Seizure

 ¶16
"A consensual encounter is one 'in which no
 restraint of the liberty of the citizen is implicated, but
 the voluntary cooperation of the citizen is elicited through
 non-coercive questioning.'" People v.
 Walters, 249 P.3d 805, 809 (Colo. 2011) (quoting
People v. Johnson, 865 P.2d 836, 842 (Colo. 1994)).
A seizure requires "either physical force . . . or,
 where that is absent, submission to the assertion of

 authority." McClain, 149 P.3d at 789-90
(omission in original) (quoting California v. Hodari
 D., 499 U.S. 621, 626 (1991)).

 ¶17
 Ultimately, in deciding whether an encounter with the police
 is consensual rather than a seizure, courts "must
 consider whether 'a reasonable person would feel free to
 decline the officers' requests or otherwise terminate the
 encounter.'" Marujo, 192 P.3d at 1006
(quoting Florida v. Bostick, 501 U.S. 429, 436
(1991)). "This test presupposes an innocent
 person." Id. "While most citizens will
 respond to a police request, the fact that people do so, and
 do so without being told they are free not to respond, hardly
 eliminates the consensual nature of the response."
People v. Paynter, 955 P.2d 68, 72 (Colo. 1998)
(quoting INS v. Delgado, 466 U.S. 210, 216 (1984)).
While the test considers the totality of the circumstances,
 "[t]he subjective intent of the officer in initiating
 the encounter is not relevant for Fourth Amendment
 purposes." Marujo, 192 P.3d at 1006 (citing
Whren v. United States, 517 U.S. 806, 813-14
(1996)).

 ¶18
"Police officers do not implicate the protections
 afforded by the Fourth Amendment by merely asking an
 individual questions, even when those questions might pertain
 to criminal conduct." Taylor, ¶ 9, 415
 P.3d at 824. If the person being questioned is "free to
 disregard the questions and walk away, there has been no
 intrusion upon that person's liberty or privacy as would
 under the Constitution require some particularized and
 objective justification." Id.

(quoting United States v. Mendenhall, 446 U.S. 544,
 554 (1980)). "While a citizen may feel instinctive
 pressure to cooperate with police officers, without an
 additional display of force or authority by the officer, this
 pressure does not suffice to transform a consensual encounter
 into a seizure." Marujo, 192 P.3d at 1008. The
 encounter only escalates to a seizure if the obligation to
 comply is "greater than the obligation an innocent
 citizen would normally feel to cooperate with the
 police." Id. at 1007.

 ¶19
 Fourth Amendment reasonableness inquiries are objective and
 fact specific. Paynter, 955 P.2d at 72-73 (relying
 on Ohio v. Robinette, 519 U.S. 33, 39 (1996)). In
 Marujo, we enumerated a nonexclusive list of factors
 to consider when assessing whether "a reasonable,
 innocent person would not feel free to decline the
 officers' requests or otherwise terminate the
 encounter." 192 P.3d at 1007 (quoting People v.
 Jackson, 39 P.3d 1174, 1184 (Colo. 2002)). These factors
 include:

(1) whether there is a display of authority or control over
 the defendant by activating the siren or any patrol car
 overhead lights;

(2) the number of officers present;

(3) whether the officer approaches in a non-threatening
 manner;

(4) whether the officer displays a weapon;

(5) whether the officer requests or demands information;

(6) whether the officer's tone of voice is conversational
 or whether it indicates that compliance with the request for
 information might be compelled;

(7) whether the officer physically touches the person of the
 citizen;

(8) whether an officer's show of authority or exercise of
 control over an individual impedes that individual's
 ability to terminate the encounter;

(9) the duration of the encounter; and

(10) whether the officer retains the citizen's
 identification or travel documents.

Id. Rather than rely upon a single factor, the court
"must consider the totality of the circumstances to
 determine whether the police exercised force or authority to
 effect a stop, or whether the police merely sought the
 voluntary cooperation of a citizen through a consensual
 encounter." Paynter, 955 P.2d at 73.

 2.
Ganaway's Initial Encounter with Law Enforcement Was Not
 a Seizure

 ¶20
 Before analyzing the Marujo factors, we first note
 that the trial court made two consequential factual findings
 unsupported by the record (which consists solely of testimony
 from Detective Foster and Detective Traudt at the suppression
 hearing). The first finding was that "the officers
 surrounded [Ganaway]" in tactical gear and altered his
 direction of travel when he walked toward the motel. Although
 both detectives testified to wearing tactical vests with
 "POLICE" lettering, they did not mention any other
 "tactical gear," such as helmets or long guns.
Additionally, Detective Foster testified that the police were
 positioned in a line about twenty feet away from Ganaway when
 the encounter began, and they

 remained in that position as Ganaway continued to approach
 them.[3] This uncontroverted testimony in no way
 suggests that the police "surrounded" Ganaway. Nor
 does it indicate that the police did anything to
 "alter[]" Ganaway's "direction of
 travel."

 ¶21
 The second trial court finding was that the officers asked
 Ganaway to "[c]ome with us . . . and describe where you
 [are] going" when he pointed to Veloz's door. But
 Detective Foster testified that Officer DeHerrera
 "greeted [Ganaway] and asked where he was going";
 again, this testimony was uncontroverted. Thus, contrary to
 the court's finding, nothing in the record suggests that
 the police told Ganaway to "[c]ome with us."

 ¶22
We conclude that these two factual findings lack competent
 record support and are, therefore, clearly erroneous. Thus,
 we set them aside for our analysis of the Marujo
 factors, which we now examine.

 ¶23
 (1) Use of sirens or lights: There was no "display of
 authority or control over [Ganaway] by activating the siren
 or any patrol car overhead lights." Marujo, 192
 P.3d at 1007. Indeed, the police patrol cars were parked out
 of sight so the police could arrive at Veloz's door
 undetected.

 ¶24
 (2) Number of officers: There were eight officers at the
 scene. The presence of more than one officer can increase the
 coerciveness of the interaction. However, "the presence
 of multiple officers does not automatically mean that a stop
 has occurred." United States v. Fields, 823
 F.3d 20, 28 (1st Cir. 2016) (quoting United States v.
 Goddard, 491 F.3d 457, 461 (D.C. Cir. 2007)).

 ¶25
 (3) Manner of approach: The officers did not approach in a
 threatening manner. In fact, they did not approach at all, as
 Ganaway walked casually toward them. Indeed, Ganaway did not
 notice the police presence until he was about twenty feet
 away from them because he had been looking down at the ground
 and not paying attention to his surroundings.

 ¶26
 (4) Display of weapons: Each officer carried a concealed
 firearm. However, the mere presence of firearms does not
 indicate that the police approached in a threatening manner.
Paynter, 955 P.2d at 73 (describing an officer's
 approach as nonthreatening when his gun was not displayed);
Marujo, 192 P.3d at 1008 (finding a consensual
 encounter when the officer did not draw a weapon). Here, the
 firearms were concealed and not drawn at any point during the
 encounter. ¶27 (5) Request or demand for information:
 Officer DeHerrera did not demand any information from
 Ganaway. Instead, Officer DeHerrera simply asked a
 question-where was he going. Questioning does not result in a
 seizure "[u]nless the circumstances of the encounter are
 so intimidating as to demonstrate that a

 reasonable person would believe he is not free to
 leave."[4] Paynter, 955 P.2d at 72; see,
 e.g., State v. Ballinger, 366 P.3d 668, 672
(Mont. 2016) (finding that no seizure occurred when an
 officer "intercepted" a couple walking toward a
 house that he was investigating by asking them where they
 were going).

 ¶28
 (6) Officers' tone of voice: A tone "indicating that
 compliance with the officer's request might be
 compelled" may indicate a seizure. Mendenhall,
 446 U.S. at 554. But here, the officers' tone was
 friendly, not threatening.

 ¶29
 (7) Physical contact: At this point, no one had physically
 touched Ganaway, as he was about twenty feet away.

 ¶30
 (8) Show of authority: A seizure does not occur unless a
 reasonable person "would have perceived that the show of
 authority was at least partly directed at him."
Brendlin v. California, 551 U.S. 249, 261 (2007);
see also Tate v. People, 2012 CO 75, ¶¶
 7-9, 290 P.3d 1268, 1269-70; Lundstrom v. Romero,
 616 F.3d 1108, 1122 (10th Cir. 2010) (finding that the police
 had not seized a woman who stepped between her boyfriend and
 an officer's pointed gun); United States v. Al
 Nasser, 555 F.3d 722, 730-31 (9th Cir. 2009) (finding
 that the police had not seized a motorist who pulled

 over upon seeing a traffic stop of other motorists). Here,
 the officers did not approach Ganaway-they were moving toward
 Veloz's motel room when Ganaway walked into their
 presence. A reasonable person in Ganaway's position would
 have understood that police activity was afoot, but he would
 not have perceived the officers' conduct to be directed
 at him.

 ¶31
 True, the police's tactical vests displaying
 "POLICE" indicate authority. However, an encounter
 does not become a seizure because of the "inherent
 social pressure to cooperate with the police" or because
 "the police do not inform the individual that he or she
 is free to leave." People v. Melton, 910 P.2d
 672, 676-77 (Colo. 1996) (citing Delgado, 466 U.S.
 at 216). Yet, a defendant may be considered seized when they
 cannot walk away from or around the officers. See
 Brown, ¶¶ 20-22, 504 P.3d at 976-77
(discussing a nonconsensual encounter where patrol vehicles
 blocked a defendant from exiting the parking lot in his
 vehicle); but cf. Taylor, ¶ 12, 415 P.3d at 825
(finding that there was no seizure at the initial encounter
 because there were "multiple avenues" for the
 defendant to walk away from or around the officer); see
 also People v. Shoen, 2017 CO 65, ¶ 13, 395 P.3d
 327, 331 (assessing officers leaving exit paths open to the
 defendant as a factor indicative of a consensual encounter).

 ¶32
 Here, the police never ordered Ganaway to say or do anything.
The officers were facing Ganaway in a line as he approached
 them. Unlike in Brown, ¶ 21,

504 P.3d at 976, where we noted that a patrol car physically
 blocking the defendant's car from moving is indicative of
 a nonconsensual encounter, there is no record of personnel or
 patrol vehicles on either side of or behind Ganaway. Instead,
 there was an unobstructed path for him to return to his car
 and exit the motel parking lot.[5] Like in Taylor, ¶
 12, 415 P.3d at 825, where there were many avenues to evade
 the officer, there was nothing preventing Ganaway from
 terminating the interaction with the police, as he could have
 turned around and exited the motel parking lot by car or by
 foot.[6] Further, the nature of the police presence
 was such that Ganaway did not notice them until he was about
 twenty feet away from them and Officer DeHerrera asked a
 question. Thus, the police did not display force or authority
 toward Ganaway that impeded his ability to terminate the
 encounter.

 ¶33
 (9) Duration of the encounter: The record does not establish
 the precise length of Officer DeHerrera's interaction
 with Ganaway. However, it was

 apparently brief since Officer DeHerrera only asked one
 question, and Ganaway simply pointed at Veloz's motel
 room in response.

 ¶34
 (10) Retention of identification: The police did not retain
 Ganaway's identification, as they had not obtained it in
 the first place.

 ¶35
 In sum, although eight armed police officers wearing tactical
 vests were twenty feet away from Ganaway, they never
 threatened Ganaway nor displayed their weapons; they did not
 demand information or compliance; and they did not touch or
 surround him or otherwise exert their control. They simply
 asked him one neutral question in a friendly tone, during a
 brief interaction. Ganaway's personal reaction to the
 police's presence is immaterial because the test of
 "whether 'a reasonable person would feel free to
 decline the officers' requests or otherwise terminate the
 encounter' . . . presupposes an innocent person."
Marujo, 192 P.3d at 1006 (quoting Bostick,
 501 U.S. at 436). Thus, we hold, based on the totality of the
 circumstances, that the initial encounter between the police
 and Ganaway was not a seizure, meaning it did not trigger
 Fourth Amendment protections.

 C.
Consent to Search

 ¶36
We next consider whether Ganaway voluntarily consented to a
 patdown in response to Detective Foster's statement,
 "I'd like to pat you down for weapons, if

 that's okay." We first analyze whether Ganaway's
 actions indicated consent. Next, we determine whether that
 consent was voluntary.

 1.
Defining Consent

 ¶37
 Under the Fourth Amendment, "[a] warrantless search may
 be justified and is constitutionally permissible when a
 citizen consents to the search." People v.
 Mendoza-Balderama, 981 P.2d 150, 156 (Colo. 1999).
Consent can be express or "implied through words,
 actions, or both." People v. Berdahl, 2019 CO
 29, ¶ 22, 440 P.3d 437, 442; see, e.g.,
 Johnson, 865 P.2d at 845 (using the defendant's
 actions as evidence of voluntary consent when no law
 enforcement officers instructed him to act in the manner that
 he did).

 ¶38
 Voluntary consent requires "essentially free and
 unconstrained choice by its maker." Schneckloth v.
 Bustamonte, 412 U.S. 218, 225 (1973). Involuntary
 consent is invalid. Id. at 233 (describing
 involuntary consent as "coerced by threats or force, or
 granted only in submission to a claim of lawful
 authority"). "[T]he Fourth and Fourteenth
 Amendments require that . . . consent not be coerced, by
 explicit or implicit means, by implied threat or covert
 force." Id. at 228. Promises or threats can
 indicate coercive behavior. Johnson, 865 P.2d at
 845.

 ¶39
 To determine whether consent was voluntary, "courts must
 apply an objective test that takes into account the totality
 of the circumstances and determines whether the defendant
 could reasonably have construed the police

 conduct to be coercive." Berdahl, ¶ 23,
 440 P.3d at 442. The test is "whether, under the
 totality of the circumstances, the police's conduct
 overbore the defendant's exercise of free will because it
 was sufficiently coercive or deceptive to a person with his
 characteristics in his circumstances." People v.
 Munoz-Gutierrez, 2015 CO 9, ¶ 24, 342 P.3d 439,
 445. To assess the totality of the circumstances, courts
 evaluate: "the defendant's age, education, and
 intelligence; the duration, location, and circumstances of
 the search; the defendant's state of mind; and any other
 factors that could have affected the defendant's free and
 unconstrained choice in consenting to the search."
Berdahl, ¶ 23, 440 P.3d at 442. While we
 consider whether a person knew they had a choice,
 "consent can be voluntary even if the defendant did not
 know that he or she was free to withhold consent."
Id. (first citing Schneckloth, 412 U.S. at
 227; and then citing People v. Chavez-Barragan, 2016
 CO 66, ¶ 38, 379 P.3d 330, 339).

 2.
Ganaway Voluntarily Consented to a Patdown

 ¶40
 First, we review Ganaway's conduct during the encounter
 with Detective Foster. Detective Foster said, "I'd
 like to pat you down for weapons, if that's okay,"
 to which Ganaway responded, "[N]o problem." Then,
 unprompted, Ganaway "put his hands out to the side . . .
 [and] turned around and backed up

 towards [Detective Foster]."[7] After Ganaway began his
 approach, Detective Foster stepped out of line with the
 officers and waited for Ganaway to reach him. There was no
 verbal exchange during Ganaway's approach. Once Ganaway
 was about a foot away, Detective Foster said,
 "That's good."

 ¶41
We conclude that these facts are sufficient to establish that
 Ganaway consented to being searched by the police.
Ganaway's reply of "no problem" served as
 express verbal consent; his subsequent walk toward Detective
 Foster, which was not directed by the police, impliedly
 reinforced this consent.

 ¶42
 Second, we consider whether Ganaway's consent was
 voluntary. We note that the police did not make any promises
 or threats to Ganaway. On the contrary, the interaction had a
 friendly tone. Further, Detective Foster's permissive
 phrasing-" Id. like to pat you down for
 weapons, if that's okay"-evinces a request
 rather than an authoritative command. See People v.
 Thomas, 839 P.2d 1174, 1176-78 (Colo. 1992) (concluding
 that the defendant's consent was voluntary where the
 officer asked "if it was okay to pat him down");
see also Marujo, 192 P.3d at 1005, 1008 (concluding
 that the defendant's consent was voluntary where the
 officer asked, "[W]ould you mind stepping over here? . .
 . Would you mind if I patted you down to check for
 weapons?"); United States v. Drayton, 536 U.S.
 194, 206-07 (2002)

(interpreting "Mind if I check you?" as a request
 for consent). Thus, to the extent that Ganaway may have felt
 Detective Foster's request to pat him down was a demand,
 the police's conduct did not cause that perception.

 ¶43
 Nor does the record otherwise indicate that Ganaway's
 consent could have been the product of duress, coercion,
 deception, or undue influence. The encounter was brief,
 consisting of two succinct questions.

 ¶44
 Moreover, there is no evidence in the record that
 Ganaway's age, education, intelligence, or state of mind
 prevented him from voluntarily consenting. True, Ganaway did
 have prior contact with law enforcement, but such experience
 does not transform a request into a command. Further, while
 Detective Foster did not expressly advise Ganaway of his
 right to refuse consent, that does not render Ganaway's
 consent involuntary. Accordingly, from the perspective of a
 reasonable person in Ganaway's position, the police's
 conduct did not overbear Ganaway's exercise of free will.

 ¶45
 For these reasons, we hold that Ganaway voluntarily consented
 to the patdown.

 III.
Conclusion

 ¶46
 For the foregoing reasons, we reverse the trial court's
 suppression order and remand the case for further proceedings
 consistent with this opinion.

 JUSTICE BERKENKOTTER, joined by JUSTICE GABRIEL, dissented.

 JUSTICE BERKENKOTTER, joined by JUSTICE GABRIEL, dissenting.

 ¶47
Oscar Jonas Ganaway was walking from his car to room 145 of
 the HomeTowne Studios motel when he heard someone ask where
 he was going. He looked up and was shocked to see eight
 officers, barely twenty feet away, wearing identical tactical
 vests conspicuously labeled "POLICE." They were
 standing in a single line against the motel's outer wall
 roughly six to ten feet from Ganaway's intended
 destination. No one else was around, and it appeared that the
 officers, one of whom immediately asked to pat him down, were
 engaged in some type of tactical operation. The majority
 concludes that a reasonable person in Ganaway's position
 would have believed that they were free to decline the
 patdown request and continue on. I disagree, and thus I
 respectfully dissent.

 ¶48
 In reversing the district court's suppression ruling, the
 majority concludes that (1) the "initial" encounter
 between the police and Ganaway was not a seizure and (2)
 Ganaway voluntarily consented to the patdown search. I
 believe that by treating the encounter as consisting of two
 distinct parts, the majority fails to adequately consider the
 totality of the circumstances surrounding the encounter.
People v. Jackson, 39 P.3d 1174, 1182 (Colo. 2002),
 abrogated on other grounds by Brendlin v.
 California, 551 U.S. 249 (2007). I also disagree with
 the majority's conclusions that the encounter between
 Ganaway and the eight officers was

 consensual and that the district court erred in granting
 Ganaway's motion to suppress the evidence seized.

 ¶49
 Because the officers lacked reasonable suspicion to seize
 Ganaway, I would affirm the district court's suppression
 order.

 I.
Legal Authority

 ¶50
 The Fourth Amendment of the United States Constitution
 protects citizens from unreasonable government searches and
 seizures. U.S. Const. amend. IV. The law recognizes three
 categories of police-citizen encounters: (1) arrests, (2)
 investigatory stops, and (3) consensual interviews.
People v. Paynter, 955 P.2d 68, 72 (Colo. 1998).
Because arrests and investigatory stops are seizures, they
 implicate the Fourth Amendment. People v. Morales,
 935 P.2d 936, 939 (Colo. 1997). They must therefore be
 justified by probable cause and reasonable suspicion,
 respectively. Jackson, 39 P.3d at 1179.

 ¶51
 Consensual encounters, in contrast, are "requests for
 cooperation" that do not implicate the Fourth Amendment.
Id.; see also Florida v. Bostick, 501 U.S.
 429, 434 (1991) (stating that an "encounter will not
 trigger Fourth Amendment scrutiny unless it loses its
 consensual nature"). "Thus, the boundary between
 consensual encounters and investigatory stops is crucial
 because it defines where the protection of the Fourth
 Amendment begins." Jackson, 39 P.3d at 1179.

 ¶52
 To determine whether an encounter is consensual, "the
 crucial test is whether, taking into account all of the
 circumstances surrounding the encounter, the police conduct
 would 'have communicated to a reasonable person that he
 was not at liberty to ignore the police presence and go about
 his business.'" Bostick, 501 U.S. at 437
(quoting Michigan v. Chesternut, 486 U.S. 567, 569
(1988)). The test "is necessarily imprecise, because it
 is designed to assess the coercive effect of police conduct,
 taken as a whole, rather than to focus on particular details
 of that conduct in isolation." Chesternut, 486
 U.S. at 573.

 ¶53
"The message that a suspect is not free to leave or
 terminate the inquiry can be conveyed, not necessarily
 intentionally, in ways less obvious than actual physical
 force or explicit command." Jones v. United
 States, 154 A.3d 591, 595 (D.C. 2017). Consequently,
 this analysis "requires an examination of the behavior
 of the parties, as well as the physical, temporal, and social
 context of the encounter." Outlaw v. People, 17
 P.3d 150, 156 (Colo. 2001). It also employs an objective
 standard, "looking to the reasonable [person's]
 interpretation of the conduct in question."
Chesternut, 486 U.S. at 574. Because the test
 focuses on what a reasonable person would understand,
 "the subjective intent of the officers is relevant . . .
 only to the extent that that intent has been conveyed to the
 person confronted." Id. at 575 n.7.

 II.
Analysis

 A.
This Was a Single Encounter

 ¶54
 The majority analyzes the encounter between Ganaway and the
 police as if it consisted of two distinct encounters. It
 concludes that the "initial encounter," when the
 police first stopped Ganaway to ask where he was going, was
 not a seizure. Maj. op. ¶ 35. It then separately
 considers whether Ganaway voluntarily consented to be patted
 down for weapons. This approach, in my view, is at odds with
 our long-standing jurisprudence requiring us to examine the
 totality of the circumstances a person faces when interacting
 with the police. See, e.g., People v.
 Marujo, 192 P.3d 1003, 1004, 1007-08 (Colo. 2008)
(treating the initial stop of a suspect and the officer's
 patdown request as a single encounter for purposes of
 determining whether the encounter was consensual).

 ¶55
 By bifurcating the event and also its analysis in this
 manner, the majority disregards the rest of the encounter
 between Ganaway and the officers in evaluating whether this
 short but charged encounter was consensual. Notably, the
 majority excludes from its consideration the circumstances
 surrounding Detective Foster's "request" to pat
 Ganaway down immediately after they stopped him a mere ten
 feet from his intended destination.

 ¶56
 In my view, this was a single encounter in which Ganaway was
 stopped and searched by the police without reasonable
 suspicion because he was in the wrong place at the wrong
 time. This was a seizure.

 B.
The Totality of the Circumstances Surrounding the Encounter
 Indicates a Seizure

 ¶57
We have identified several factors to aid in determining
 whether "a reasonable, innocent person would not feel
 free to decline the officers' requests or otherwise
 terminate the encounter." Marujo, 192 P.3d at
 1007 (quoting Jackson, 39 P.3d at 1184). These
 factors are neither exhaustive nor exclusive. Id.
"Words and actions can reasonably be perceived
 differently depending on the surroundings, which provide
 important context." Dozier v. United States,
 220 A.3d 933, 947 (D.C. 2019). This is one of the reasons why
 we have repeatedly emphasized that the "totality of the
 circumstances analysis requires an examination of the
 behavior of the parties, as well as the physical, temporal,
 and social context of the encounter." Outlaw,
 17 P.3d at 156; see also Chesternut, 486 U.S. at 573
(stating that what constitutes a seizure "will vary, not
 only with the particular police conduct at issue, but also
 with the setting in which the conduct occurs").

 ¶58
 Sometimes, the circumstances surrounding a person's
 encounter with the police "are so intimidating as to
 demonstrate that a reasonable, innocent person would not feel
 free to decline the officers' requests or otherwise
 terminate the

 encounter." Jackson, 39 P.3d at 1183-84
(setting forth a number of non-exhaustive factors pertinent
 to a totality of the circumstances analysis); see also
People v. Heilman, 52 P.3d 224, 228-29 (Colo. 2002)
(finding that "the officer was not seeking [the
 defendant's] cooperation and he was not free to
 leave"). For instance, the Supreme Court has emphasized
 that the "threatening presence of several officers"
 can indicate a seizure. United States v. Mendenhall,
 446 U.S. 544, 554 (1980). This court has similarly identified
 factors relevant to determining whether a person has been
 seized, including "the number of officers present . . .
 [and] whether an officer's show of authority or exercise
 of control over an individual impedes that individual's
 ability to terminate the encounter." Marujo,
 192 P.3d at 1007 (quoting Jackson, 39 P.3d at 1184).
In some instances, "the 'strong presence of two or
 three factors' may be sufficient to support the
 conclusion a seizure occurred." United States v.
 Lopez, 443 F.3d 1280, 1284-85 (10th Cir. 2006) (quoting
Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1203
(10th Cir. 2006)).

 ¶59
 In weighing the Marujo factors, the majority
 acknowledges that the presence of more than one officer can
 increase the coerciveness of an interaction. Maj. op. ¶
 24. However, that was not the case here-according to the
 majority-because, it suggests, the presence of eight officers
 dressed in tactical gear was so unobtrusive that Ganaway did
 not even notice them. Id. at ¶ 32. And because
 the majority also determines that none of the other factors
 weigh in favor of finding a

 seizure, it concludes that the encounter was consensual,
 meaning it did not trigger Fourth Amendment protections.
Id. at ¶ 35.

 ¶60
 I see the encounter very differently.

 ¶61
 To begin, there was nothing unobtrusive about the police
 presence. The sudden appearance of eight officers in
 tactical gear is drastically different from an encounter with
 one or two officers. In numerous other cases, the presence of
 large numbers of officers have supported the conclusion that
 a defendant was seized. For instance, in United States v.
 Ward, 961 F.2d 1526, 1533 (10th Cir. 1992), the Tenth
 Circuit noted that being "outnumbered by at least two
 officers" "support[ed] the conclusion that [the]
defendant was seized" because "the presence of more
 than one officer increases the coerciveness of an
 encounter." See also United States v. Bloom,
 975 F.2d 1447, 1454 (10th Cir. 1992) (concluding that the
 presence of multiple officers increased the coerciveness of
 the encounter because the defendant was "outnumbered,
 and he knew it"); United States v. Glass, 128
 F.3d 1398, 1406 (10th Cir. 1997) (stating that the Tenth
 Circuit has "considered it significant [when] . . . more
 than one officer confronted the subject"); United
 States v. Anderson, 663 F.2d 934, 939-40 (9th Cir. 1981)
(holding that the encounter was "clearly a
 'seizure'" when the individual was confronted by
 "five DEA agents, one LAPD officer, plus four uniformed
 Orange County deputy sheriffs").

 ¶62
 The majority downplays the number of officers present,
 suggesting that the eight police officers were so unobtrusive
 that "Ganaway did not notice them until he was about
 twenty feet away from them." Maj. op. ¶ 32. True,
 Ganaway did not notice the officers until they stopped him,
 but that is because the officers went to great lengths to
 avoid being detected. Why? Because the officers' intended
 destination was also room 145. They were there to arrest
 Anthony Veloz, who, Detective Foster explained, had "a
 high propensity to arm [himself] with handguns."
Veloz's associates did as well, according to the
 Detective, and so the officers were concerned for their
 safety.

 ¶63
 This is why, in the Detective's words, the eight officers
 were "creep[ing]" up the side of the motel in a
 row. This is also why the officers stopped in their tracks
 some six to ten feet from Veloz's motel room when they
 saw Ganaway park twenty yards away, exit his car, and
 walk-head down-towards Veloz's room. And, finally, this
 is why-even though they lacked reasonable suspicion to stop
 him-the officers nonetheless stopped Ganaway and then
 immediately searched him just before he got to Veloz's
 room. The officers didn't know whether Ganaway saw them,
 and as Detective Foster testified, they wanted to make sure
 he didn't alert Veloz "that law enforcement was,
 essentially, stacking up on his front door."

 ¶64
 Detective Foster's testimony indicates that Ganaway was
 not free to continue his day until the officers' tactical
 operation-the arrest of Veloz-was completed. As the majority
 explains, an individual is seized if they do not "feel
 free to decline the officers' requests or otherwise
 terminate the encounter." Maj. op. ¶ 17 (quoting
Marujo, 192 P.3d at 1006). And like any reasonable
 person under these circumstances, Ganaway did not feel free
 to decline the officer's request or terminate the
 encounter. This was a seizure.

 ¶65
 Of course, the officers' subjective intent-whether they
 intended to seize Ganaway-is not relevant unless they
 communicated that intent to him. Chesternut, 486
 U.S. at 575 n.7. But here, the number, location, and behavior
 of the officers communicated volumes. Outlaw, 17
 P.3d at 156. And so did Ganaway's behavior. We need only
 look to his responses to the stop (his jaw literally dropped)
 and to the "request" that he submit to a patdown
 search immediately thereafter. He moved to the officers
 without, apparently, being asked to do so: first, sticking
 his arms out like a scarecrow, then looking over his
 shoulder, and slowly walking backwards until he reached the
 officers. His was not the behavior of someone who felt free
 to deny the officer's request and continue on his way.

 ¶66
 Another factor that weighs in favor of finding that Ganaway
 was seized is the physical appearance of the eight officers.
United States v. Black, 707 F.3d 531, 538 (4th Cir.
2013) (concluding that the defendant was seized because of
 the

"collective show of authority by the [seven] uniformed
 police officers"). As Detective Foster testified, all
 eight officers were dressed in "ballistic vests that had
 very large . . . conspicuous police markings." And while
 the officers here did not brandish their weapons, a
 reasonable person would not necessarily believe that eight
 police officers outfitted in tactical vests conspicuously
 labeled "POLICE" were unarmed. See Ward,
 961 F.2d at 1533 n.6 (relying on United States v.
 Grant, 920 F.2d 376, 382 (6th Cir. 1990)).

 ¶67
 I consider, as well, the fact that Ganaway was stopped when
 no other people were around. "When confronted by
 authorities in . . . a public place, a reasonable person is
 less likely to feel that he is unable to decline the
 agent's request or otherwise terminate the
 encounter." United States v. Zapata, 997 F.2d
 751, 757 (10th Cir. 1993); see also Ward, 961 F.2d
 at 1532 (stating that "in a public setting . . . the
 reasonable innocent person is less likely to feel singled out
 as the officers' specific target"). But
 police-citizen interactions that occur in public places in
 the absence of other members of the public can be viewed as a
 factor pointing toward a nonconsensual encounter. United
 States v. Hernandez, 847 F.3d 1257, 1265 (10th Cir.
2017). Thus, the fact that Ganaway was stopped by
 eight officers in tactical vests and immediately searched
 when no one else was around, in my view, favors finding a
 seizure.

 ¶68
 Certainly, there are some factors that I regard as neutral or
 favoring a consensual encounter. These include the
 officers' tone of voice and lack of physical contact. On
 balance, however, the totality of the circumstances here
 weighs heavily in favor of finding a seizure. The
 intimidating nature of the encounter was compounded by the
 speed at which it unfolded. Ganaway was alone, the eight
 officers were trying to remain out of sight, he did not see
 them until they stopped him, and then they immediately
 searched him to prevent him from reaching his intended
 destination, which happened to be the officers' intended
 destination as well. See Jones, 154 A.3d at 596
(concluding that the "circumstances are more
 intimidating if the person is by himself, if more than one
 officer is present, or if the encounter occurs in a location
 that is secluded or out of public sight"). Even if
 Ganaway could, in theory, have walked by the officers,
 "the greater number of officers and their positioning
 created an intimidating environment that psychologically, if
 not physically, 'substantially reduced' the ease with
 which [he] could have avoided the police."
Dozier, 220 A.3d at 945-46 (quoting Jones,
 154 A.3d at 597). That is, the officers exercised their
 authority in a manner which made it apparent to Ganaway that
 he was not free to ignore them and proceed on his way.

 III.
Conclusion

 ¶69
 Because the officers seized Ganaway without reasonable
 suspicion to do so, I would affirm the district court's
 suppression order.

---------

[1] The record is unclear as to whether
 there were seven or eight officers present. For the purposes
 of this opinion, we assume that there were eight.

[2] The People properly certified this
 appeal "is not taken for the purpose of delay" and
 "the evidence is a substantial part of the proof of the
 charge pending against the defendant," pursuant to
 section 16-12-102(2), C.R.S. (2024).

[3] Detective Foster testified when
 discussing the subsequent patdown, "[W]e were, kind of,
 in like a line, and I stepped out to my right and just waited
 for [Ganaway] to back up to me."

[4] Additionally, the subjective
 suspicions of the police and why they ask a question are
 irrelevant to the seizure analysis unless the
 "officer's subjective intent in approaching the
 individual is communicated to that individual."
People v. Melton, 910 P.2d 672, 677 (Colo. 1996)
(citing Mendenhall, 446 U.S. at 554 n.6). In this
 case, the police did not communicate their reasons for
 engaging Ganaway to him.

[5] The suppression hearing testimony
 explains that all the patrol cars were parked south of the
 officers. The exit to the parking lot was north of Ganaway
 and his vehicle.

[6] Though the exit path here was
 perfectly clear, it need not be for the encounter to be
 consensual. See People v. Cascio, 932 P.2d 1381,
 1387-88 (Colo. 1997) (finding a consensual encounter when the
 defendants would have needed to maneuver their car in a
 manner similar to parallel parking in order to exit).

[7] The officers did not request that
 Ganaway approach in this manner. Additionally, Detective
 Foster testified that having someone put their arms out to
 the side for a patdown is not his normal practice.

---------